AMBRIT, INC., f/k/a the Isaly Company, Inc., Plaintiff-Appellee, Cross-Appellant,

v.

KRAFT, INC., Defendant-Appellant, Cross-Appellee.

No. 85–3609.

United States Court of Appeals, Eleventh Circuit.

Dec. 10, 1986.*

Certiorari Denied May 4, 1987. See 107 S.Ct. 1983.

* This opinion, previously published at 805 F.2d 974, is republished to reflect the correct appear- ances of counsel.

Barry D. Rein, Robert M. Kunstadt, Michael C. Stuart, Pennie & Edmonds, New York City, Thomas H. Christopher, Kilpatrick & Cody, Atlanta, Ga., Jerry L. Newman, Rodney W. Morgan, Shear, Newman & Hahn, Tampa, Fla., for plaintiff-appellee, cross-appellant.

Jerome Gilson, Gary M. Ropski, Susan Somers Neal, William Brinks Olds Hofer Gilson & Lione Ltd., Chicago, Ill., Frank C. Jones, Charles M. Shaffer, Jr., King & Spalding, Atlanta, Ga., Donald W. Carlin, Seth A. Eisner, Dolores K. Hanna, Kraft, Inc., Glenview, Ill., for defendant-appellant, cross-appellee.

Before CLARK, Circuit Judge, HENDERSON,* and WISDOM,** Senior Circuit Judges.

WISDOM, Senior Circuit Judge:

This appeal presents a variety of questions involving trade dress and trademark rights. The parties are competitors in the ice cream novelty market. The principal

---

* See Rule 3(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable John Minor Wisdom, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

question in this controversy is whether the trade dress of Kraft's Polar B'ar infringes the trade dress of Isaly's Klondike bar. The district court answered "Yes" to this question. 619 F.Supp. 983. We affirm, holding that the district court's findings were not clearly erroneous and that the court's conclusions of law were correct.

### FACTS

The plaintiff in this action, the Isaly Company, Inc., ("Isaly"),[1] is a Delaware corporation with its principal place of business in Clearwater, Florida. The defendant, Kraft, Inc. ("Kraft"), is a Delaware corporation with its principal place of business in Glenview, Illinois. The parties are competitors in the stickless, five ounce, square, chocolate-covered ice cream bar market. Isaly sells its bar under the trademark "Klondike", and Kraft sells its bar under the trademark "Polar B'ar". The crux of the controversy concerns the packaging of those two products.

Isaly began in the last century as a family-owned dairy business operating in Eastern Ohio and Western Pennsylvania. In 1928 Isaly started making and selling five ounce, chocolate-covered, stickless ice cream bars under the name "Klondike". Isaly now sells three versions of the Klondike bar: plain, crispy, and chocolate/chocolate. The plain Klondike bar has been wrapped in pebbled foil featuring the colors silver, blue, and white since the 1940's. Since at least 1956 the wrapper has featured a $3 \times 3$ inch panel of silver, white, and blue, the words "Isaly's" and "Klondike", and the figure of a polar bear.

In 1978 Isaly revised the wrapper of the Klondike bar maintaining, however, the impression the original wrapper conveyed. The colors, images, and words on the wrapper remained the same, but "Klondike" was emphasized, "Isaly's" was reduced in size, and the stance of the polar bear was altered. Since 1978, the wrapper has remained the same. The plain Klondike bar is wrapped in pebbled foil presenting a $3 \times 3$ inch silver panel featuring a white polar bear on all fours before a sunburst design. Both the polar bear and the sunburst are outlined and highlighted with royal blue. Below the bear is the word "Klondike", written in large white letters outlined in royal blue. "Isaly's" appears in small blue letters to the right of the bear. The crispy and chocolate/chocolate wrappers are identical except that those wrappers use the colors yellow and brown respectively in place of the white color used on the plain wrapper.

Isaly began selling the Klondike in a six-pack arrangement in 1963, and between 1963 and 1978 some six-packs were offered in trays overwrapped in clear plastic. Since 1978, all six-packs have been sold in transparently overwrapped trays with a double layer of three bars, presenting the Klondike wrapper three times. The trays are silver and feature a large numeral "6" on the side. The end panels of the Klondike trays display a copy of the appropriate wrapper design depending on the version of the bar contained in the tray.

Until 1978, Isaly sold the Klondike bar in a tri-state area composed of Western Pennsylvania, Eastern Ohio, and Northern West Virginia. Isaly advertised in newspapers and in point-of-sales materials in stores, both of which featured the polar bear emblem found on the bar's wrapper. Isaly also advertised on television in a commercial featuring a polar bear and prospector in a supermarket.

In 1978, Isaly began to investigate the possibility of expanding the market for the Klondike bar. Isaly decided to introduce the bar into supermarkets and convenience stores in various expansion markets. To augment the expansion it achieved on its own, Isaly approached Kraft, an international manufacturer and distributor of food products, concerning a distribution arrangement between the two parties. Although Kraft's dairy group produces its own ice cream products, which are principally distributed under the brand names "Sealtest" and "Breyers", since 1970 that

---

1. Since instituting this action in 1982, Isaly has changed its name to AmBrit, Inc. We shall refer to the company as "Isaly" throughout this opinion.

group has also distributed ice cream products made by other companies. The parties agreed that Kraft would distribute the Klondike bar in Florida and that Isaly would be responsible for most of the advertising in that market.

The introduction of the Klondike bar into the Florida market in early 1979 was highly successful and Kraft was well satisfied. Kraft had previously been unsuccessful with its ice cream novelty line and viewed the Klondike bar as a way to change that pattern. In October 1979, Kraft informed Isaly that it was interested in purchasing Isaly or having Isaly package its bars for Kraft under the Sealtest name. Isaly rejected these proposals, suggesting instead that Kraft expand its distribution of the Klondike bar. Kraft stated, however, that it was reluctant to expand distribution without a proprietary interest in the product.

In late 1979, Kraft began to develop its own five ounce chocolate-covered ice cream bar. Kraft attempted to duplicate the exact size and taste of the Klondike bar. Kraft chose the name "Polar B'ar" after finding that name on a list of unused trademarks. A predecessor of Kraft, Southern Dairies, Inc., had sold an ice cream bar under that trademark from 1929 to 1932, and periodically renewed the trademark registration. Through merger, Kraft acquired it.

Kraft employed two firms to design the packaging for the Polar B'ar product, making clear to these firms that the functional features of the Polar B'ar package were to resemble as closely as possible the Klondike bar package. The bars were to be wrapped in foil and sold in six-pack trays overwrapped in transparent plastic. Kraft supplied these design firms with samples of the Klondike packaging to aid them in their efforts.

The designers presented Kraft with a number of different wrapper designs but ultimately chose the one Isaly now challenges. That wrapper presents a 3 × 3 pebbled silver foil panel with a white polar bear standing on all fours contained within a colored triangle in the bottom right corner. "Polar B'ar" is written in large colored block letters diagonally across the center of the bar. "Sealtest" is written in script in a red box in the upper left corner, and the phrase "made with real milk chocolate" appears in a red circle in the bottom left corner of the panel.

In 1980 Kraft sold Polar B'ars in two forms: plain and "crunchy". The colors of the triangle and block letters on the wrappers varied with each version. Plain wrappers used royal blue and "crunchy" wrappers used red. Later, Kraft introduced four new versions of the bar: chocolate, mint, heavenly hash, and peanut butter, using the colors brown, green, light blue, and golden brown respectively.

As planned, Kraft sold Polar B'ars in a six-pack tray overwrapped in clear plastic. The tray employs a silver background and displays a large numeral "6" between the brand name and the product description. The end panels of Kraft's tray feature a large white polar bear and the words "Polar B'ar" in large block letters against a background colored to correspond with the version of the bar contained in the tray. Kraft promoted the bar with television and newspaper advertising. Its television commercial featured the figure of a bear. Then came a bear's roar when the camera shifted to the polar bar wrapper.

Kraft was the exclusive distributor of the Klondike bar in Florida from 1979 to 1982. In February 1982 Kraft notified Isaly in writing of its intention to terminate its distribution of Klondike as of April 1982. In May 1982 Isaly initiated this suit. Isaly asserted that Kraft's packaging: (1) constituted a false designation of origin under § 43(a) of the Lanham Act,[2] (2) infringed Isaly's federal trademarks covering its label and package designs,[3] (3) constituted common law unfair competition, (4) diluted Isaly's trade dress in violation of Florida statutory law,[4] and (5) constituted unfair

---

2. 15 U.S.C. § 1125(a).

3. 15 U.S.C. § 1114(1).

4. Fla.Stat. § 495.151 et seq.

competition under Florida law.[5] Isaly later amended its complaint seeking to have Kraft's Polar B'ar trademark cancelled. Kraft denied all of Isaly's claims and asserted the defense of laches. After a long trial, the district court ruled in favor of Isaly on the trademark and false designation of origin claims.[6] The court rejected Kraft's laches defense and Isaly's request to cancel Kraft's trademark. The court then entered an injunctive order and scheduled a hearing on the damages issue.[7] Both parties appealed.

## DISCUSSION

### I. Trade Dress Infringement

Kraft's first contention on appeal is that the district court erred in finding Kraft guilty of trade dress infringement. Kraft does not contend that the district court applied the wrong test in making this finding, but rather argues that the district court misapplied the proper test.

Section 43(a) of the Lanham Act states in relevant part:

Any person who shall ... use in connection with any goods or services, or any container or containers for goods ... any false description or representation, including words or other symbols tending falsely to describe or represent the same ... shall be liable to a civil action by ... any person who believes he is or is likely to be damaged by the use of any such false description or representation.[8]

**5.** Fla.Stat. § 501.201 *et seq.*

**6.** The district court did not address the state law claims separately, apparently ruling that a resolution of those claims was unnecessary in the light of its disposition of the federal claims. Because neither party has specifically raised this as a point of error and because of our disposition of the federal claims, we need not review the district court's handling of the state law claims.

**7.** The parties had entered into a pre-trial stipulation that the trial court would address only the liability issues and that subsequent proceedings would deal with the damages issue if necessary.

**8.** 15 U.S.C. § 1125(a).

**9.** *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 830–32 (11th Cir.1982);

This Court has held that Section 43(a) creates a federal cause of action for trade dress infringement.[9] As we stated in *John Harland Co. v. Clarke Checks, Inc.*,[10] " 'Trade Dress' involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." [11] The trade dress at issue in this controversy is the wrapper and packaging of Isaly's Klondike bar.

As the district court below held, to prevail on a trade dress infringement claim under § 43(a), the plaintiff must prove three elements: 1) its trade dress is inherently distinctive or has acquired secondary meaning, 2) its trade dress is primarily non-functional, and 3) the defendant's trade dress is confusingly similar.[12] The district court found that Isaly had established all three elements and therefore ruled in favor of Isaly on the trade dress infringement claim. Kraft contends that the district court erred in its conclusion with respect to each element. Because each element involves a finding of fact, we cannot overturn the decision of the district court absent clear error on at least one element. We now review the district court's findings.

### A. Inherent Distinctiveness or Secondary Meaning

At the outset, the plaintiff must establish that its trade dress is inherently distinctive or has acquired secondary meaning.[13]

*Sun-Fun Products, Inc. v. Suntan Research & Development, Inc.*, 656 F.2d 186, 192 (5th Cir. Unit B 1981).

**10.** 711 F.2d 966 (11th Cir.1983).

**11.** *Id.* at 980, *citing, Original Appalachian Artworks, Inc.*, 684 F.2d at 831.

**12.** *Brooks Shoe Mfg. Co. v. Suave Shoe Corp.*, 716 F.2d 854, 857 (11th Cir.1983); *John H. Harland Co.*, 711 F.2d at 980.

**13.** *See Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 702 (5th Cir. Unit A 1981), *cert. denied*, 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982). *See also University of Georgia Athletic Association v. Laite*, 756 F.2d 1535, 1540–41 (11th Cir.1985) holding that an inherently distinctive service-

Manifestly, if the plaintiff's trade dress is not sufficiently distinctive to allow consumers to identify the product from the trade dress, then the dress does not inherently serve as an indication of origin and the plaintiff can claim no right to the exclusive use of that trade dress. Even if a competitor appropriated the identical trade dress, the plaintiff would not be injured because the plaintiff's trade dress does not serve to distinguish its goods from those of its competitor's. Alternatively, a finding of secondary meaning [14] suffices to establish protectability because such a finding means that notwithstanding the indistinctiveness of the trade dress, the consuming public has come to associate that trade dress with the product's producer.

The district court found that at the time Polar B'ar was introduced in 1980, the trade dress of Isaly's Klondike was inherently distinctive and had acquired secondary meaning. Kraft challenges both of these findings. Because we hold that the district court's finding with respect to inherent distinctiveness is not clearly erroneous, we need not address the secondary meaning issue.

In assessing the inherent distinctiveness of the Klondike trade dress, the district court considered the factors enunciated by this Court in *Brooks Shoe Manufacturing Co. v. Suave Shoe Corporation,*[15] where

we stated that a court should examine the trade dress and consider, among other factors:

> whether it [is] a "common" basic shape or design, whether it [is] unique or unusual in a particular field, [and] whether it [is] a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods.... [16]

■ Unlike the "V" or "7" in *Brooks,* the Klondike trade dress is not a basic shape or common design. Rather, as the district court found, the Klondike wrapper with its square size, bright coloring, pebbled texture, polar bear and sunburst images, and distinctive style of printing is "a complex composite of size, color, texture and graphics.... [creating] a distinctive visual impression".[17] The court, hewing close to the language in *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.,*[18] noted that the wrapper includes features that are "arbitrary and serve no function either to describe the product or assist in its effective packaging",[19] and found the wrapper trade dress inherently distinctive.

Kraft challenges this finding on two grounds. It first argues that the silver foil, the color royal blue, and the arctic sun

mark is protectable under § 43(a) without showing of secondary meaning. We have not previously ruled that inherently distinctive trade dress can be protected under § 43(a) without a showing of secondary meaning, but we have on several occasions noted the merit of such an approach. *E.g., University of Georgia Athletic Association,* 756 F.2d at 1541 & n. 14; *John H. Harland Co.,* 711 F.2d at 981 n. 25; *Brooks Shoe Mfg. Co.,* 716 F.2d at 857 & n. 9. The Fifth Circuit has adopted such an approach in *Chevron Chemical Co.,* and although that decision is not binding in this circuit, *see Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc) (all decisions of Fifth Circuit handed down *before* October 1, 1981, are binding precedent in the Eleventh Circuit), it is entitled to great weight because it is based on cases of the former Fifth Circuit that are binding precedent in this circuit. *Original Appalachian Artworks, Inc.,* 684 F.2d at 831 n. 14. Our holding in *University of Georgia Athletic Assoc.* that an inherently distinctive trademark or servicemark may be protected under § 43(a) without a showing of secondary meaning, foreshadowed our

decision today extending that rule to trade dress as well. 756 F.2d at 1540–41. *See generally Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417, 426 n. 7 (5th Cir.1984) discussing the rationale for not requiring secondary meaning before extending protection to inherently distinctive trade dress.

**14.** Secondary meaning is the connection in the consumer's mind between the mark and the product's producer, whether that producer is known or unknown.

**15.** 716 F.2d 854 (11th Cir.1983).

**16.** *Id.* at 858 quoting *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.,* 568 F.2d 1342, 1344 (C.C.P.A.1977).

**17.** Order at 11–12.

**18.** 659 F.2d 695, 702 (5th Cir.1981).

**19.** Order at 11.

and polar bear images all connote cold and are therefore not inherently distinctive when used in connection with ice cream novelties. Kraft also argues that third parties have used these same elements in connection with their packaging of ice cream products and frozen desserts. Kraft asserts that when viewed in context of the *Brooks* factors, these third party uses indicate that the Klondike trade dress is not unique and is a mere refinement of a commonly-adopted form of ornamentation for ice cream products. The district court rejected both of these arguments. The ruling was not clearly erroneous.

Trademarks and trade dress may be classified as generic, descriptive, suggestive, or arbitrary.[20] Once conceived as distinct categories, these rubrics are now commonly viewed as "central tones in a spectrum".[21] Within this spectrum, the distinctiveness of a product's trade dress increases as it moves toward the suggestive or arbitrary end of the spectrum. The overall appearance of the Klondike trade dress and of its constituent elements is arbitrary or suggestive.[22] The trade dress does not describe the ice cream product, rather it suggests to the consumer the coldness of the product. Such trade dress is inherently distinctive under Section 43(a).[23]

Isolated or piecemeal third party uses of various elements of the Klondike trade dress do not detract from the distinctiveness of the overall impression conveyed by the combination of those elements on the Klondike wrapper. Indeed, third party use of one or more suggestive or arbitrary elements of a plaintiff's trade dress renders that trade dress indistinct only if the third party use is so extensive and so similar to the plaintiff's that it impairs the ability of consumers to use the trade dress of the products to identify their source.[24] Extensive and similar use is not present in the instant case. Indeed, the record reveals no prior use of any combination of the Klondike trade dress elements that is at all similar to the unique impression conveyed by Isaly's trade dress.

The district court did not commit clear error in ruling that the Klondike trade dress was inherently distinctive and therefore protectable without a showing of secondary meaning.[25]

**20.** As this court stated in *Freedom Savings and Loan Assoc. v. Way*, 757 F.2d 1176 (11th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 134, 88 L.Ed.2d 110 (1985).

Generic marks refer to a particular genus or class of which an individual service [or product] is but a member; such marks may never receive ... protection. Descriptive marks directly describe a characteristic or quality of the service [or product], and can only be protected if they have acquired "secondary meaning." "Vision Center," when used to describe a place to purchase eyeglasses, would be a descriptive name. Suggestive marks subtly connote something about the service [or product] so that a consumer could use his or her imagination and determine the nature of the service [or product]. The term "Penguin" would be suggestive of refrigerators.

... An arbitrary or fanciful mark is a word in common usage applied to a service [or product] unrelated to its meaning; "Sun Bank" is such an arbitrary or fanciful mark when applied to banking services.

*Id.* at 1182 n. 5 (citations omitted).

**21.** *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 346 (5th Cir.1984), *quoting, Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 (5th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981).

**22.** That the Patent and Trademark Office issued trademarks covering the trade dress at issue without requiring a showing of secondary meaning bolsters the conclusion that the Klondike trade dress is not generic or descriptive.

**23.** *See Chevron Chemical Co.*, 659 F.2d at 702 (trade dress is protectable if it is arbitrary and not descriptive), *University of Georgia Athletic Assoc.*, 756 F.2d at 1541; *CPG Prods. Corp. v. Pegasus Luggage, Inc.*, 776 F.2d 1007, 1012 (Fed. Cir.1985) (construing Eleventh Circuit precedents).

**24.** *See generally University of Georgia Athletic Assoc.*, 756 F.2d 1535, finding a servicemark inherently distinctive notwithstanding third party uses, because most third parties had not used a substantially similar servicemark and those who had did not use mark extensively.

**25.** That the threshold of inherent distinctiveness for trade dress is relatively low does not necessarily mean that the first competitor in a market can, through appropriation and use, monopolize trade dress elements that the consuming public would naturally associate with the type of product being offered. Except in instances where a *particular element* of trade dress is inherently distinctive and therefore able to serve as an indicator of service, § 43(a) protects not the individual elements of a producer's trade dress,

### B. Functionality

■ Trade dress is protectible under section 43(a) only if it is primarily nonfunctional.[26] The district court found the Klondike tray with its plastic overwrap functional. Kraft was therefore free to imitate those features of the Klondike packaging with complete impunity. A contrary result would hinder Kraft in its attempt to compete effectively with Isaly.

■ That individual elements of packaging are functional does not, however, render the package as a whole unprotectible.[27] The district court found that "the Klondike foil wrapper, with its graphics, is primarily nonfunctional".[28] Kraft does not seriously dispute this finding, and indeed any such challenge would be misplaced. The actual wrapper may be functional, but its appearance is not. That the wrapper is primarily nonfunctional does not mean that Kraft may not use a foil wrapper in connection with the packaging of its five-ounce ice cream novelties. Rather, Kraft is precluded only from using a foil wrapper with an overall appearance that is confusingly similar to the wrapper used in Isaly.

### C. Likelihood of Confusion

■ "[T]he touchstone test for a violation of § 43(a) is the "likelihood of confusion" resulting from the defendant's adoption of a trade dress similar to the plaintiff's."[29] In determining whether a likelihood of confusion exists, the fact finder evaluates a number of elements including: the strength of the trade dress, the similarity of design, the similarity of the product, the similarity of retail outlets and purchasers, the similarity of advertising media used, the defendant's intent, and actual confusion.[30] The issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists. Rather, a court must evaluate the weight to be accorded the individual factors and then make its ultimate decision.[31] The appropriate weight to be given to each of these factors varies with the circumstances of the case.

The district court evaluated these factors, weighed them carefully, and found that Kraft's trade dress creates a likelihood of confusion. Kraft rejects this finding arguing that the district court misapplied the above test. A finding of likelihood of confusion is a finding of fact and is reviewed by this court under the clearly erroneous standard.[32] Although that standard is not applicable "when a district court labors under a misapprehension concerning the governing legal norms",[33] we find that in evaluating a likelihood of confusion the district court properly applied the appropri-

---

but rather their combination and the unique impression conveyed by that combination. In *Chevron Chemical Co.,* the court extended protection to a mere combination of colors in a simple three band design. 659 F.2d 695. But the *Chevron* court was quick to point out that latecomers were free to use the same colors or the same design as long as their trade dress did not convey the same visual impression. *Id.* at 703. In the same vein, latecomers in the five ounce chocolate-covered ice cream bar market may use certain elements of the Klondike trade dress as long as their use does not convey the same visual impression.

**26.** *See generally Sicilia Di R. Biebow & Co.,* 732 F.2d at 426–30, discussing the distinction between features that are functional and those that are not.

**27.** *See, e.g., Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 203–04 (2d Cir.1979), cited with approval in *John H. Harland Co.,* 711 F.2d at 982–84.

**28.** Order at 17.

**29.** *Original Appalachian Artworks, Inc.,* 684 F.2d at 831–32.

**30.** *Exxon Corp. v. Texas Motor Exchange of Houston, Inc.,* 628 F.2d 500, 504 (5th Cir.1980); *Original Appalachian Artworks, Inc.,* 684 F.2d at 832.

**31.** *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 840 n. 17 (11th Cir.1983).

**32.** *Id.* at 840; *Exxon Corp.,* 628 F.2d at 504.

**33.** *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 384 (5th Cir. 1977).

ate legal test.[34] Our review is thereby confined to an inquiry as to whether the court's finding is clearly erroneous. A survey of the likelihood of confusion factors in this case convinces us that the district court's finding is not clearly erroneous.

### 1. Strength of the Trade Dress

The strength of the Klondike trade dress determines the scope of protection it will receive: strong trade dress receives strong protection, and weak trade dress receives weak protection. The strength of a particular trade dress is determined by a number of factors that establish its standing in the marketplace.[35] Relying on its finding that the trade dress was inherently distinctive and had acquired secondary meaning, the district court concluded that the Klondike trade dress was strong. A more thorough analysis, however, is needed to determine the scope of protection appropriate for the Klondike trade dress. A finding of inherent distinctiveness indicates that the Klondike trade dress will be protected, but the appropriate degree of protection is determined by examining a number of factors that establish the standing of the trade dress in the marketplace: most notably, the type of trade dress and the extent of the third party uses.[36]

In analyzing the scope of protection a particular trade dress warrants, a court must first consider the type of trade dress involved. As noted above, trade dress may be classified as generic, descriptive, suggestive, or arbitrary, and the scope of protection increases as the trade dress moves toward the arbitrary end of the spectrum. Isaly's trade dress is composed of a number of elements suggesting the coldness of the Klondike bar. The Klondike trade dress is therefore mainly suggestive. Although there is no clear pattern in this circuit as to what type of protection suggestive trade dress warrants under § 43(a)[37], we hold that the mainly suggestive Klondike trade dress merits at least moderate protection.

The second scope-of-protection factor is the extent of third party use. As noted in the discussion of inherent distinctiveness, a number of third parties have used various elements of the Klondike trade dress. The record indicates that, in connection with the sale of frozen desserts, at least eight third parties have used a polar bear image, and that numerous third parties have used silver foil, an arctic sun image, or the royal blue color. Although not as extensive as the third party uses that have led to weak protection in other cases,[38] these uses do require the court to extend less protection to the Klondike wrapper than it would in their absence. Use of isolated elements of the Klondike trade dress that do not convey the same total image does not, however, lead to the Klondike wrapper being stripped of protection.[39]

---

**34.** *See Sun Banks of Florida, Inc. v. Sun Fed. Sav. & Loan Assoc.,* 651 F.2d 311, 314 (5th Cir.1981) (statement in *Kentucky Fried Chicken Corp.* "may not be taken as an erosion of the standard of review applicable to a finding of likelihood of confusion").

**35.** *Sun Banks of Florida, Inc.,* 651 F.2d at 315.

**36.** *Id.* at 315–17; *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,* 675 F.2d 1160, 1164 (11th Cir.1982); *John H. Harland Co.,* 711 F.2d at 975. The strength of the mark analysis is much the same as the inherent distinctiveness analysis. While the latter is concerned with determining whether a threshold level of distinctiveness has been reached, the former is more thorough in that its goal is to determine the degree of distinctiveness of a particular trade dress.

**37.** *Compare John H. Harland Co.,* 711 F.2d at 975 ("suggestive or possibly ... descriptive" mark accorded weak protection) *with Safeway*

*Stores, Inc.,* 675 F.2d at 1165 (suggestive mark is "relatively strong one") *and University of Georgia Athletic Assoc.,* 756 F.2d at 1545 (mark that is suggestive if not arbitrary characterized as "strong").

**38.** *See Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 259 (5th Cir.) (72 third party uses led to weak protection), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *Sun Banks of Florida, Inc.,* 651 F.2d at 316 (4400 uses in Florida alone led to weak protection). *But see Safeway Stores, Inc.,* 675 F.2d at 1165 ("score" of third party uses did not prevent suggestive mark from being "relatively strong").

**39.** *University of Georgia Athletic Assoc.,* 756 F.2d at 1545 (third party users do not necessarily diminish a mark's strength); *Safeway Stores, Inc.,* 675 F.2d at 1165.

Our review of the evidence leads us to conclude that were we to make the determination as to the strength of Isaly's trade dress *de novo*, we would accord that trade dress moderate, as opposed to either strong or weak, protection.[40] The Klondike trade dress is suggestive, and third parties have used most of the elements of that trade dress. We need not decide, however, whether the district court's finding that the Klondike trade dress warranted strong protection is clearly erroneous. Given that the amalgam of the other likelihood of confusion factors points so strongly in favor of a finding of likelihood of confusion, it does not matter whether the Klondike trade dress is accorded strong or moderate protection, for in either case, the finding of likelihood of confusion is not clearly erroneous.

### 2. Similarity of Design

The similarity of design test has been described as " 'really nothing more than a subjective eyeball test.' ... The similarity of design is determined by considering the overall impression created by the mark as a whole rather than simply comparing indi-vidual features of the marks."[41] Following this approach, the district court stated, "Upon visual inspection, the wrapped bars convey the same overall appearance."[42]

Kraft strenuously objects to this finding. Kraft asserts that in making its finding of similarity of design the court disregarded the word marks "Sealtest", "Polar B'ar", "Isaly's", and "Klondike". Kraft also argues that a comparison of the packages reveals many differences including a different overall impression.

Kraft is correct in asserting that the presence of dissimilar word marks lessens the possibility of a finding of similarity of design.[43] Use of distinguishing word marks does not, however, preclude a finding of similarity of design.[44] The similarity of design test is an inquiry into the overall similarity of the defendant's trade dress with that of the plaintiff. Therefore, the dissimilar word marks may not be considered separately; rather, they must be considered in the context of the trade dress as a whole.

Even a cursory reading of the district court's order makes clear that in analyzing the overall appearance of the trade dress of

---

**40.** The district court also found that the Klondike trade dress had acquired secondary meaning. This finding is probative on the strength of the mark issue because it also establishes the mark's standing in the marketplace. See *John H. Harland Co.*, 711 F.2d at 974 n. 13.

Kraft challenges the district court's finding of secondary meaning. We agree with Kraft that Isaly's extensive sales—36 million bars in the 1980 fiscal year—and advertising do not necessarily establish secondary meaning. See *Aloe Cream Laboratories, Inc. v. Milsan, Inc.*, 423 F.2d 845, 850 (5th Cir.) (key issue in secondary meaning inquiry is not extent of promotional efforts but their effectiveness), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970). But sales and advertising may be considered by the finder of fact in making the secondary meaning inquiry. *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1513 (11th Cir.1984). The district court's finding of secondary meaning is not clearly erroneous. *See Brooks Shoe Mfg. Co.*, 716 F.2d at 860 (finding on secondary meaning issue reversible only for clear error).

The existence of secondary meaning leads to greater protection for the Klondike's trade dress. On the other hand, the Klondike trade dress is protectable mainly because it presents a "distinctive visual impression", not because the elements of that trade dress are arbitrary or unusual. As the Fifth Circuit held in *Falcon Rice Mill, Inc.*, a "distinctive visual impression" normally receives weak protection. 725 F.2d at 346. Nonetheless, a "distinctive visual impression" will be protected. *See Chevron Chemical Co.*, 659 F.2d 695. And indeed, a "distinctive visual impression" composed of suggestive elements will be accorded greater protection than one composed of generic or descriptive elements. *Cf. Falcon Rice Mill, Inc.*, 725 F.2d 336.

**41.** *Exxon Corp.*, 628 F.2d 504–05 (citation omitted).

**42.** Order at 19.

**43.** *John H. Harland Co.*, 711 F.2d at 980 n. 24. That the defendant has placed on its products marks that are different from those employed by the plaintiff is also probative on the intent and actual confusion factors under the likelihood of confusion test.

**44.** *See John H. Harland Co.*, 711 F.2d 981, n. 24; *see generally Sun-Fun Products, Inc.*, 656 F.2d 186 (likelihood of confusion possible notwithstanding dissimilar word marks); *Chevron Chemical Co.*, 659 F.2d 695 (finding similarity of design and likelihood of confusion notwithstanding dissimilar word marks).

the products the district court did not disregard the dissimilar word marks. Indeed, the court even mentioned that each wrapper displayed "the product name printed in large block letters, accompanied by the company name (Sealtest or Isaly's) in much smaller script lettering".[45]

Kraft next argues that the design and color of the trade dress of each product are simply not similar. Kraft points again to the dissimilar word marks and also to the differences between the modern design of the Polar B'ar trade dress and the old-fashioned tone of the Klondike trade dress. In assessing Kraft's contention, it is important to remember that, regardless of the ready accessibility of the exhibits to the reviewing court and the ability of this Court to see as well as the district court, the district court's finding that the designs are similar is still reversible only for clear error.[46]

Viewing the trade dress as a whole, the overall impression conveyed by each is similar. An inspection of the wrappers of the plain Klondike and the plain Polar B'ar [47] reveals that each is the same size, each has a textured silver foil background, each is printed primarily with blue and white inks, each includes the product name in large block letters and the company name in smaller script, and each features a polar bear.[48] Although a close examination of the two wrappers reveals significant differences, a court may not view trade dress in a vacuum. Rather, a court must consider how the trade dress would function in the actual market place. Ice cream novelties are impulse items stored in frosty freezer cases and sold in busy grocery stores to hurried shoppers. When viewed in this context, the general similarity of the design of the trade dress of the two products is an even stronger indication of the existence of likelihood of confusion.

3. Similarity of the Products

That the products involved are similar is evidence tending to prove the existence of a likelihood of confusion.[49] The district court found and we agree that the products in the instant case are identical. Both are competitively priced, five ounce, stickless, chocolate-covered ice cream bars.

4. Similarity of Retail Outlets and Purchasers

Likelihood of confusion is more probable if the products are sold through the same channels to the same purchasers.[50] The district court found that the products are both sold through the same channels, pri-

45. Order at 19.

46. Relying on *Sicilia Di R. Biebow & Co.,* 732 F.2d 417, and *John H. Harland Co.,* 711 F.2d 966, Kraft asserts that this court is in as good a position to apply the subjective eyeball test as the lower court. In essence Kraft is asking this court to review the finding of similarity of design *de novo.* We decline this invitation.

A finding of similarity is a finding of fact reversible only for clear error. *Jellibeans, Inc.,* 716 F.2d at 842. *Sicilia Di R. Biebow & Co.* and *John H. Harland Co.* are not to the contrary. In both of those cases, the appellate court undertook an analysis of the similarity of the designs, but that does not mean that those courts were substituting their own judgment for that of the district court. Rather, each of those appellate courts was simply evaluating the evidence to determine whether the district court's decision was clearly erroneous.

Moreover, the Supreme Court's recent decision in *Anderson v. City of Bessemer,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), makes clear that an appellate court reviewing a finding of fact is constrained by the clearly erroneous standard even when the finding of fact does not turn on the credibility of witnesses or was such that the reviewing court was in as good a position as the district court to review the evidence.

47. The district court discussed at length only the similarities between the wrappers for the plain bars but found that all of Kraft's wrappers were similar to Isaly's. We agree with that conclusion and take a parallel approach in assessing the similarity of design of the trade dress.

48. Although we have described the elements of the wrappers that are similar, we are not making a comparison of individual elements. Rather, we are explaining why the overall impression of each wrapper is similar. The district court correctly followed this same approach.

We note that the manner in which the products are presented to the consumers, in the overwrapped six-pack trays, amplifies the similarity of the trade dress.

49. *Exxon Corp.,* 628 F.2d at 505.

50. *Id.*

marily supermarkets and convenience stores, to the same purchasers. Kraft has not challenged this finding.

### 5. Similarity of Advertising Media

If the plaintiff and defendant both use the same advertising media, a finding of likelihood of confusion is more probable.[51] The district court found that both parties use the same advertising media, primarily television and radio, and that the advertisements were themselves similar. This finding is clearly correct.

### 6. Defendant's Intent

Kraft's intent in adopting the Polar B'ar trade dress is a critical factor because a finding that Kraft adopted the trade dress with the intent of deriving benefit from the reputation of Isaly's Klondike may alone be enough to justify the inference that there is confusing similarity.[52] In assessing the intent factor, the district court found that "Kraft intended to emulate if not infringe".[53] Kraft and Isaly have both argued as to the meaning of that phrase and as to whether the evidence supports the position of the other party. After reviewing that phrase and the context in which it is found, we are convinced that the district court's finding was based on solid evidence that Kraft intended to benefit from the goodwill of Isaly. We turn now to examine the evidence supporting that finding.

In early 1979, Kraft began distributing the Klondike bar for Isaly in Florida. The introduction of the Klondike bar in Florida was surprisingly successful. Kraft had been searching for an appropriate ice cream novelty product, and after witnessing the success of the Klondike bar, Kraft approached Isaly with an offer to either buy Isaly or have Isaly pack Klondike bars for Kraft under the Sealtest label. Isaly rejected this offer, proposing instead that Kraft expand its distribution of the Klondike bar. Kraft rejected that offer.

As a result of the distribution relationship, Kraft learned of Isaly's expansion plans for the Klondike bar and of information vital to the successful sale of an ice cream novelty like the Klondike bar. In late 1979, Kraft began developing its own five ounce, stickless, chocolate-covered ice cream bar. Kraft attempted to develop a bar that was, in almost all respects, identical with the highly successful Klondike bar.

Kraft chose to name its new product "Polar B'ar", a name that conveys a double meaning: "polar bear" and "cold bar". At the time it chose the name, Kraft was aware that the Klondike wrapper featured a polar bear. Moreover, prior to the time Kraft selected the name for its product, Isaly had undertaken some promotional and other efforts to develop an association between the polar bear symbol and the Klondike bar.[54]

Kraft retained two design firms to design the packaging for the Polar B'ar. It is undisputed that Kraft requested these firms to copy the functional features of the Klondike packaging, such as the six-pack tray, the dead fold foil wrapper, and the clear plastic overwrap. To help achieve this goal, Kraft supplied the design firms with samples of the Klondike packaging and wrapper. It is also clear that, given the name Kraft had chosen for its product, the use of a polar bear image on the Polar B'ar wrapper was a foregone conclusion.

The design firms offered Kraft a number of wrapper prototypes employing a variety of graphic designs. Kraft chose the design that Isaly is now challenging. The record reveals that Kraft knew of the distinct possibility that the wrapper design it chose infringed the Klondike trade dress. But Kraft never sought an opinion from legal counsel on that issue.[55]

---

**51.** *Id.* at 506.

**52.** *Amstar Corp.,* 615 F.2d at 263; *Exxon Corp.,* 628 F.2d at 506.

**53.** Order at 23.

**54.** In addition to using commercials and a wrapper featuring a polar bear, Isaly had been involved with highly publicized activities such as donating polar bears to the Philadelphia Zoo.

**55.** Isaly infers that Kraft never sought a legal opinion for fear that such an opinion would

Isaly argues that the unmistakable import of this evidence is that Kraft chose deliberately to come as close to the total image of the Klondike bar as possible. According to Isaly, even though Kraft may have intended to stay within legal bounds, it copied the Klondike bar and functional packaging features exactly and attempted to copy the Klondike trade dress to a sufficient degree that when combined with the other packaging features, Kraft would benefit from the reputation of Isaly's Klondike. Isaly correctly points out that even an intent to come as close as the law will allow is an intent to derive benefit from the other party's reputation and is therefore probative on the likelihood of confusion issue.[56] Indeed, Isaly argues that Kraft even chose its name with the intent of deriving benefit from Isaly's reputation.

Kraft argues, however, that it had no such intent to derive benefit from the reputation of Isaly. Rather, Kraft argues that it copied only those features that it had the right to copy, those that were in the public domain.[57] Kraft asserts that it copied those features not to benefit from Isaly's reputation, but to let the consumers know that they would be getting the same type of product as that offered by Isaly. Kraft points to the word mark "Polar B'ar", which it asserts is clearly not confusing with the "Klondike" word mark, and to the "Sealtest" logo, and argues that if it had been attempting to poach the goodwill of Isaly, it would not have used these distinctive and different marks.[58]

There is no question that Kraft's argument finds support in the evidence—as does Isaly's—but even were we to accept Kraft's position, the district court's finding of intent on the part of Kraft to benefit from Isaly's goodwill would be proper. There is nothing unusual about a finding of intent based on circumstantial evidence.[59] Although Kraft was free to copy the Klondike product and the functional packaging features of that product, the finder of fact may infer from evidence of such actions an intent to derive benefit from Isaly's goodwill.[60] Such a finding is especially fitting when, as here, a review of Kraft's nonfunctional trade dress and that of the plaintiff reveals substantial similarities. Therefore, irrespective of which version of the facts is to be believed, the record supports the district court's finding that Kraft intended to benefit from the goodwill Isaly has built for itself.[61]

### 7. Actual Confusion

Actual consumer confusion is the best evidence of likelihood of confusion.[62] There is no absolute scale as to how many instances of actual confusion establish the existence of that factor. Rather, the court must evaluate the evidence of actual confusion in the light of the totality of the circumstances involved.[63]

---

confirm the concern expressed by several people involved with the development of the Polar B'ar concept and product: that the Polar B'ar wrapper infringed the Klondike wrapper.

**56.** *John H. Harland Co.,* 711 F.2d at 977–78.

**57.** *Id.* at 982 (absent copyright or patent protection, functional features may be copied with complete impugnity).

**58.** The thrust of this argument is diminished to some degree because one of the connotations of "Polar B'ar" conveys the same impression as the polar bear image Isaly was promoting.

**59.** *Jellibeans, Inc.,* 716 F.2d at 843.

**60.** *John H. Harland Co.,* 711 F.2d at 977 & n. 16.

**61.** The parties' previous contractual or business relations is also probative on the likelihood of

confusion issue. *Sun-Fun Products, Inc.,* 656 F.2d at 189. In this case we view those business relations as a subfactor relating to intent. Kraft and Isaly had significant business dealings and through this association, Isaly allowed Kraft access to certain confidential information.

**62.** *Amstar Corp.,* 615 F.2d at 263; *John H. Harland Co.,* 711 F.2d at 978.

**63.** *Jellibeans, Inc.,* 716 F.2d at 844. *Compare Safeway Stores, Inc.,* 675 F.2d at 1167 (two instances established actual confusion) *and Jellibeans, Inc.,* 716 F.2d at 844 (three instances establish actual confusion) *with Amstar Corp.,* 615 F.2d at 263 (three instances of confusion involving noncustomers in 15 years of concurrent use raises presumption against likelihood of confusion) *and Sun Banks of Florida, Inc.,* 651 F.2d at 319 (19 instances of confusion involving mostly noncustomers is not evidence of likelihood of confusion).

In the instant case, Isaly presented four consumers who testified that they had been confused while making purchases in the market place. Each of the witnesses had notified Isaly of his or her confusion by letter or telephone. Isaly also introduced survey evidence on the actual confusion issue. The district court gave little weight to that survey,[64] but based on the testimony of Isaly's witnesses, the court found that "there is some indication of actual confusion".[65] Kraft argues that the evidence is insufficient to support the finding of actual confusion. Kraft asserts that the number of instances of confusion is quite low given the extensive sales involved, and that those individuals who were confused were careless. Moreover, Kraft argues that the district court erred when it failed to credit the evidence Kraft presented to refute Isaly's actual confusion evidence. Kraft introduced its own survey and also presented several "typical consumers" who testified that they were not confused.

Viewed in the light of the totality of the circumstances, Kraft's protestations are without merit. With respect to Kraft's assertion that the reported instances of confusion are small given the high volume of sales, we note that it takes very little evidence to establish the existence of the actual confusion factor.[66] Moreover, that there were only a few reported instances of actual confusion does not mean that only those individuals were actually confused. As the *Chevron Chemical Co.* court stated: "It would be exceedingly difficult to detect instances of actual confusion when, as here, the goods are relatively inexpensive and their actual properties are exactly identical".[67] It is likely that many consumers who were confused never realized they had been confused and that many of those who did realize they had been confused chose not to spend the time to register a complaint with a faceless corporation about the packaging of an item that retails for approximately $2.50 per six-pack. Given these circumstances, four bona fide instances of actual confusion are sufficient to support the district court's finding of actual confusion. Kraft's argument that the four instances of confusion are inconsequential because these consumers were careless misses the point. Ice cream novelties are an impulse item that consumers purchase without a great deal of care. There is no indication that the four consumers who reported their confusion to Isaly were anything other than typical consumers following normal buying patterns. Finally, the district court properly gave little weight to Kraft's survey[68] and "typical consumer" witnesses.[69]

Although the evidence of actual confusion is far from overwhelming, the district court's finding of actual confusion is sup-

---

64. Isaly's survey was an in-store survey. The district court discounted its probative value because of procedural and methodological errors. The evidentiary value of the survey is questionable because it was done in such a way that many subjective factors were involved in the finding of confusion.

65. Order at 23.

66. *Jellibeans, Inc.*, 716 F.2d at 845; *see also World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir.1971).

67. 659 F.2d at 704.

68. Although this court has noted a trend away from according great weight to survey evidence in cases such as this, *see Safeway Stores, Inc.*, 675 F.2d at 1167 n. 10, survey evidence can be probative on the actual confusion issue. Kraft offered an in-home consumer survey. The interviewees were asked who made the Polar B'ar

product. Most identified Sealtest or Kraft as the Maker. The district court gave little weight to this survey because of "procedural and methodological errors". Order at 23. The district court was most concerned that the interviewees "were never shown the Klondike bar while Kraft's Polar B'ar was displayed before the consumer thereby permitting the interviewees to read the label". *Id.*

A finder of fact has great latitude in determining the appropriate weight to accord particular evidence. Kraft's in-home survey did little to duplicate the circumstances confronting an actual consumer in the marketplace. The district court was therefore well within its discretion when it accorded the Kraft survey little weight.

69. Kraft offered the testimony of several consumers who testified that they had not been confused. The district court properly disregarded this evidence. If Kraft could not find at least a handful of consumers who would agree to testify that they had not been confused, it might as well have defaulted.

ported by the evidence and is not clearly erroneous.

### 8. The District Court's Finding

The district court considered each of the above factors and found that, when weighed together, they established a likelihood of confusion. As noted before, our review of that finding is under the clearly erroneous standard. We may therefore overturn the district court's finding only if, after reviewing all the evidence, we are left with the "definite and firm conviction that a mistake has been committed".[70] That the district court erred in its analysis of one of the subsidiary factors in the likelihood of confusion test is not enough to allow us to overturn the district court's decision.[71] Rather, we must be convinced that the district court's ultimate conclusion—that the plaintiff established a likelihood of confusion—is clearly erroneous.

■ A review of the likelihood of confusion factors reveals the following: Isaly's trade dress merits only moderate protection, the design of the trade dress of both parties is somewhat similar, the products are identical, the retail channels and purchasers are identical, the advertising media is identical, Kraft's actions provide the basis for a finding of intent to benefit from Isaly's goodwill, and there is some evidence

of actual confusion. Although some fact finders might not have necessarily found a likelihood of confusion, we are compelled to hold that the district court's finding is not clearly erroneous.[72]

The district court's finding that Isaly had established the requisite elements of a trade dress infringement case—inherent distinctiveness, nonfunctionality, and likelihood of confusion—is not clearly erroneous. The district court's verdict in favor of Isaly on the trade dress infringement claim is therefore affirmed.[73]

### II. Laches

■ Kraft next contends that the district court abused its discretion when it refused to rule that laches barred Isaly from relief. To establish laches, a defendant must demonstrate 1) a delay in asserting a right or a claim, 2) that the delay was not excusable, and 3) that there was undue prejudice to the party against whom the claim is asserted.[74] The district court found that Isaly's delay in asserting its claim was reasonable[75] and that even if the delay had been unreasonable, it was excusable. The court also found that Kraft had suffered no prejudice as a result of Isaly's delay. Finally, the court noted that any prejudice Kraft did suffer was outweighed by the public

---

**70.** *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948); *accord University of Georgia Athletic Assoc.,* 756 F.2d at 1543 (clearly erroneous standard presents "formidable challenge" to appellant seeking to overturn district court's finding of fact).

**71.** *Freedom Sav. & Loan Assoc.,* 757 F.2d at 1186 (although district court clearly erred on one factor, its ultimate conclusion of likelihood of confusion was not clearly erroneous).

**72.** See *John H. Harland Co.,* 711 F.2d at 980 ("although we would not necessarily have found a likelihood of confusion on these facts ... we affirm").

**73.** Kraft also challenges the district court's finding that Kraft infringed the registered trademarks of Isaly in violation of § 32(1)(a) of the Lanham Act. 15 U.S.C. § 1114(1)(a). Although the analysis in a § 43(a) claim is somewhat broader than that in a § 32(1) claim, *Sun-Fun*

*Products, Inc.,* 656 F.2d at 192, our review of the evidence in the light of this principle convinces us that the district court's verdict in favor of Isaly on the § 32(1)(a) claim is not clearly erroneous. The verdict is therefore affirmed.

**74.** *Citibank, N.A. v. Citibanc Group, Inc.,* 724 F.2d 1540, 1546 (11th Cir.1984), *citing, Environmental Defense Fund, Inc. v. Alexander,* 614 F.2d 474, 478 (5th Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980). There is no argument that the delay in this case was so outrageous and unreasonable that laches may be established without a showing of prejudice. See *University of Pittsburgh v. Champion Products, Inc.,* 686 F.2d 1040, 1044–45 (3d Cir.), *cert. denied,* 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982); *Conagra, Inc.,* 743 F.2d at 1517 n. 15.

**75.** The court's finding that the delay was "reasonable" equates with a finding that there was no delay and that the first element of the laches defense had not been established.

interest in avoiding confusion.[76] On the basis of those findings, the court rejected Kraft's laches defense. Our review of that decision is circumscribed by the abuse of discretion standard.[77]

■ In this case, the delay—the time between the point at which Isaly became aware of the Kraft wrapper and packaging and the point at which Isaly filed suit or notified Kraft that its wrapper and packaging infringed that of Isaly—was under two years. Kraft has cited no case in which a delay of less than two years was found to constitute laches. Indeed, the Court of Appeals for the Sixth Circuit recently held that, because the Lanham Act does not contain a statute of limitations, the period for analogous state law claims is to be used as a touchstone for laches.[78] The pertinent limitations period for this type of action in Florida is four years, over twice the length of time in issue here.[79]

Not only was Isaly's delay short, but Isaly provided an excuse for the delay that did occur. At the time Isaly became aware of Kraft's infringing packaging, Kraft was serving as Isaly's distributor in Florida. The Florida sales represented a large portion of Isaly's total sales. Threatening Kraft immediately with litigation would have jeopardized the entire Klondike operation.[80] Rather than threatening Kraft with a lawsuit, Isaly continued the distribution relationship while attempting to encourage Kraft to expand its distribution of the Klondike bar. Obviously, if Kraft expanded its distribution of the Klondike bar, it would have dropped its own product. Litigation would therefore have been unnecessary. The economic positions of the two firms dictated that Isaly approach the problem cautiously, which Isaly did. When Isaly realized that such a tack was going to be fruitless and that Kraft was committed to the Polar B'ar product, it instituted litigation promptly. Isaly's short delay was therefore excusable.[81]

Kraft contends that given the extensive prejudice it suffered as a result of Isaly's delay, its laches defense is valid notwithstanding the brevity of and the reason for the delay. Kraft argues that it has spent millions of dollars on the development and promotion of the Polar B'ar that it would not have spent had Isaly presented its claim immediately. The district court rejected this argument, finding instead that Kraft would have spent the money even if Isaly had notified it immediately.[82] As not-

---

**76.** See *Conagra, Inc.,* 743 F.2d at 1517 ("although a defendant suffers some prejudice, the public interest in avoiding confusion might outweigh that prejudice"), *citing, James Burrough, Ltd. v. Sign of the Beefeater, Inc.,* 572 F.2d 574, 578 (7th Cir.1978).

**77.** *Environmental Defense Fund, Inc.,* 614 F.2d at 478.

**78.** *Tandy Corp. v. Malone & Hyde, Inc.,* 769 F.2d 362, 365 (6th Cir.1985), *cert. denied,* 106 S.Ct. 2277, 90 L.Ed.2d 716 (1986).

**79.** Fla.Stat. § 95.11(3).

**80.** Relying on *Citibank, N.A.,* 724 F.2d at 1546, Kraft argues that Isaly did not have to undertake litigation to protect its rights; rather, a simple written or verbal objection would have sufficed. Although there is evidence that an Isaly employee made such an objection, we address the issue as if Isaly had made no objection.

It is likely that any pointed objection would have been the equivalent of filing a lawsuit as far as the effects on the relations between Kraft and Isaly are concerned. Kraft might well have viewed any objection as a threat of litigation and an attempt to strongarm Kraft into an expanded distribution agreement. Such a threat would undoubtedly chill the relations between Kraft and Isaly.

**81.** This is not to say that a delay is excusable any time a party's immediate enforcement of its rights will cause it economic injury. In this case, however, Isaly's delay was short, and Isaly was attempting to avoid litigation and a breakdown in relations by seeking a solution that would make confrontation unnecessary.

**82.** In assessing the prejudice issue, the district court properly focused not on how much money Kraft spent, but on how much Kraft spent that it would not have spent had Isaly immediately informed Kraft of its objection. Moreover, unless Kraft was convinced that its product would not be successful unless packaged in the infringing trade dress, Kraft's expenditures to develop the product itself are irrelevant because they are unrelated to the package design. Those expenditures can be recovered no matter what trade dress is used on the packaging. The same is not true for money spent to develop or promote the infringing trade dress.

ed above, Kraft was well aware from the beginning that its Polar B'ar wrapper possibly infringed the Klondike wrapper, but this did not deter Kraft from spending money from the outset promoting and advertising that product.[83] Kraft was also aware that it was in Isaly's interest to avoid litigation or ill feelings and to continue the distribution arrangement. That Isaly filed suit when it did could not have come as a surprise to Kraft. Even after Isaly filed this action, Kraft continued to spend money promoting and advertising its Polar B'ar product. It therefore appears that Kraft was committed to the Polar B'ar product from the outset and believed it would prevail in any lawsuit challenging the product's wrapper and packaging.

The evidence supports the court's findings of reasonable and excusable delay and little or no prejudice from that delay. The court did not abuse its discretion in rejecting Kraft's laches defense.

### III. Scope of the Injunction

Kraft next challenges two portions of the district court's injunction. The injunction prohibits Kraft from marketing "a five ounce chocolate covered ice cream bar bearing a label, or contained in a tray bearing a label, which features a picture, drawing or other representation of a polar bear"[84] and from marketing "a five ounce chocolate covered ice cream bar in pebbled foil wrappers bearing a label featuring the color royal blue".[85] Kraft argues that the injunction is overly broad. Kraft contends that because the trademark and trade dress infringement claims involve the overall appearance of the wrapper, it was improper for the court to isolate only two elements, the polar bear image and the royal blue color, and preclude Kraft from using those elements.[86] We review the district court's order only for an abuse of discretion; "[t]he trial judge's ability to formulate a decree tailored to deal with the violations existent in each case is normally superior to that of any reviewing court, due to his familiarity with the testimony and exhibits."[87]

### A. The Polar Bear

■ Kraft argues that Isaly has no right to the exclusive use of a polar bear in connection with the sale of ice cream novelties and that the injunction improperly precludes Kraft from using any polar bear image irrespective both of the polar bear's appearance and of whether the overall appearance of the wrapper is confusingly similar to the Klondike wrapper.[88] While Kraft may be correct that Isaly has no exclusive right to use a polar bear image, it is important to keep in mind that the injunction prohibits Kraft from using a polar bear image only on a five ounce chocolate-covered ice cream bar. Kraft is therefore

---

83. The court found that Isaly learned of the Kraft trade dress when the Polar B'ar was introduced in 1980. Order at 27. Kraft cannot deny that it spent a large amount promoting the Polar B'ar before Isaly became aware of the Kraft trade dress. Kraft spent even more money before Isaly had a reasonable time to evaluate its rights.

84. Order at 32. Isaly asserts that the district court's order effectively precludes Kraft from using the word mark "Polar B'ar" or any word mark that sounds or looks similar to the words "polar bear". We disagree. The court's order prohibits Kraft from using a polar bear *image*, it does not deal with word marks.

85. *Id.*

86. We disagree. It is within the power of a court of equity to fashion appropriate relief. An equity court is not confined merely to pro-scribing the use of a "confusingly similar" mark. *Cf. John H. Harland Co.*, 711 F.2d at 984–85. Moreover, at no point has Kraft suggested what it would consider appropriate injunctive relief.

87. *United States v. Loew's, Inc.*, 371 U.S. 38, 52, 83 S.Ct. 97, 105–06, 9 L.Ed.2d 11, 22 (1962).

88. Kraft contends that it will be competitively disadvantaged if it is precluded from using a polar bear image on its ice cream products. Kraft, however, managed very well for almost half a century without using a polar bear image in connection with the sale of any of its products. *See also Chevron Chemical Co.*, 659 F.2d at 705 ("[A] competitive business, once convicted of unfair competition in a given particular, should thereafter be required to keep a safe distance from the margin line—even if that requirement involves a handicap as compared with those who have not disqualified themselves."), *quoting, Broderick & Bascom Rope Co. v. Manoff*, 41 F.2d 353, 354 (6th Cir.1930).

free to use a polar bear image on other products,[89] and other competitors may use a polar bear image so long as their uses do not infringe Isaly's rights. Additionally, as the former Fifth Circuit noted:

> An injunction can be therapeutic as well as protective. In fashioning relief against a party who has transgressed the governing legal standards, a court of equity is free to proscribe activities that, standing alone, would have been unassailable."[90]

Even though Isaly may have had no separate right to the use of the polar bear image in connection with five ounce chocolate-covered ice cream bars, the district court did not abuse its discretion by precluding Kraft from using a polar bear image on the wrappers or trays[91] used to package its five ounce chocolate-covered ice cream bar.[92]

### B. Royal Blue Color

■ A more difficult question is presented by Kraft's challenge of that part of the district court's order precluding Kraft from featuring the color royal blue on a textured foil wrapper. The general rule is that "no seller can foreclose others absolutely from using any particular color".[93] Relying on *Re Owens-Corning Fiberglas Corp.*,[94] Isaly argues that the Lanham Act does protect color alone. Even if we were to accept the logic of that decision, we would still preclude Isaly from attempting to monopolize the color royal blue because there is no evidence that the color royal blue can or does serve an origin indicating function in connection with the sale of ice cream products. Royal blue is a "cool color"; it is suggestive of coldness and used by a multitude of ice cream and frozen dessert producers. A court of equity may preclude an infringer from conduct that would otherwise have been unassailable, but because of the widespread use of the color royal blue and its inability to serve as an origin indicator,[95] any order precluding Kraft from using the color royal blue must be tailored to achieve the goal of protecting the consuming public from confusion.

With this standard in mind, we hold that the district court's order is overly broad. That order broadly precludes Kraft from

**89.** Of course, Kraft cannot circumvent the intent of the court's order by selling a 4.9 ounce bar or a bar covered with artificial chocolate. Compliance with an injunction cannot be avoided by an overly literal or hypertechnical reading of the injunction. *Cf. McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 69 S.Ct. 38, 93 L.Ed. 599 (1949).

**90.** *Kentucky Fried Chicken Corp.*, 549 F.2d 390, citing, *Loew's, Inc.*, 371 U.S. at 53, 83 S.Ct. at 106, 9 L.Ed.2d at 22–23; *accord Chevron Chemical Co.*, 659 F.2d at 705.

**91.** Although the district court's analysis was directed primarily toward the wrappers of each product, it was not improper for the court to fashion an order that reaches the graphics on the six-pack trays as well. The end panel of the Klondike tray displays a reproduction of a portion of the Klondike wrapper and the end panel of the Polar B'ar tray displays graphics similar to those found on the Polar B'ar wrapper. The district court determined that to protect Isaly, Kraft should not be allowed to use a polar bear image on its trays. The district court did not abuse its discretion by so ordering.

**92.** *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145 (5th Cir.1985), is not to the contrary. In *Conan*, the Fifth Circuit enjoined any use of the term "Conan" that conjured up any image of the Conan the Barbarian theme. The court chose, however, not to enjoin the use of the word "Conan" itself. We note, as did the Fifth Circuit, that the term "Conan" is a surname and can therefore be regarded as a descriptive term. *Id.* at 155. The polar bear image is, however, suggestive and therefore deserving of more protection. Moreover, there is evidence in the instant case that Isaly has developed a degree of association between itself and the polar bar image. The *Conan* court specifically found that there was no evidence that the term "Conan" alone had achieved any secondary meaning. *Id.* Moreover, the *Conan* court was fashioning injunctive relief rather than reviewing an order of a district court for an abuse of discretion. We defer to the district court's conclusion that broad injunctive relief is necessary to protect Isaly.

**93.** *Falcon Rice Mill, Inc.*, 725 F.2d at 346.

**94.** 774 F.2d 1116 (Fed.Cir.1985) (color pink when used in connection with insulation may be subject to protection).

**95.** On this score, the polar bear image is different from the color royal blue. The polar bear image can and does serve a source indicating function. Moreover, the polar bear image is a far more memorable feature of the Klondike trade dress than the color royal blue.

featuring the color royal blue on a textured foil wrapper. We remand this matter to the district court with instructions to tailor a more narrow order.[96] In all other respects, those portions of the district court's order enjoining Kraft from using the polar bear image and the color royal blue are affirmed.[97]

## IV. Monetary Relief

Kraft urges this court to rule that Isaly is, as a matter of law, entitled to recover no damages. We decline this invitation and remand the damages issue to the district court with instructions to consider the issues raised by Kraft involving whether Isaly is entitled to damages.

In a case such as this, a plaintiff may recover a monetary award only if the defendant infringed the plaintiff's rights, and the plaintiff is entitled to a monetary recovery as a result of that infringement. Only after these two elements are established

need the court consider the amount the plaintiff should recover. It is clear that the trial established Kraft's infringement; it is also clear that the issue of the amount of damages was reserved for subsequent proceedings.[98] It is unclear whether the court ever determined that Kraft's infringement entitled Isaly to a monetary recovery. Neither the court's order of June 15, 1985,[99] nor the pretrial order answers this question.[100]

Because the district court did not clearly address the entitlement issue, that issue is not properly before us in our review of the district court's interlocutory injunctive order.[101] The entitlement issue involves questions of fact that we are not in a position to address. We therefore remand that issue to the district court.[102]

## V. Abandonment

On cross-appeal, Isaly argues that the district court erred in refusing to cancel

**96.** An appropriate order might prohibit Kraft from using the color royal blue on a textured silver foil wrapper for a five ounce chocolate-covered ice cream bar when that use causes the Kraft wrapper to be confusingly similar to the Klondike wrapper. Such an order, which is only a suggestion, would not "allow [Isaly] to preclude others absolutely from using [a] particular color". Cf. *Falcon Rice Mill, Inc.,* 725 F.2d at 346. Rather, it would preclude only Kraft from using the color royal blue, and it would so preclude Kraft only if Kraft's use led to confusing similarity. We leave the matter to the district court's discretion.

**97.** On cross-appeal, Isaly contends that the court's order should be strengthened to prevent Kraft from continuing to infringe its registered trademarks. Specifically, Isaly suggests that the order should enjoin Kraft from using any trade dress that is "confusingly similar" to Isaly's. We find that the order crafted by the district court is sufficient to protect Isaly's rights.

Our refusal to alter the district court's order in this manner does not give Kraft *carte blanche* to use trade dress that is confusingly similar to Isaly's as long as Kraft does not offend the literal requirements of the order. To avoid burdening the order with details, the order will be read sufficiently broadly to protect Isaly's rights as recognized in this decision.

**98.** Pre-trial Order dated January 31, 1984, at 1–2.

**99.** Order at 33–34. The damages section of the district court's order is merely a recitation of the law of damages generally and contains no

discussion of entitlement. We decline to infer from the silence that the court rejected Kraft's argument that Isaly is not entitled to damages. Indeed the order specifically states that "all issues relating to Plaintiff's claim for damages" shall be decided at later proceedings.

**100.** On the one hand, the pre-trial order states that at trial the court will consider the issues of liability and entitlement to damages while reserving any issue as to the appropriate amount of damages. Pre-trial Order at 1–2. On the other hand, the pre-trial order states that Kraft reserves "the right to contend that the question of its profits is not material or relevant to the issue of the plaintiff's entitlement to damages". *Id.* at 2. The pre-trial order therefore offers little guidance as to whether the court considered the entitlement issue.

**101.** Even if it were clear that the district court had addressed the entitlement issue we would not review its decision at this time. Kraft is appealing not a final order but an interlocutory injunctive order. Our appellant jurisdiction is therefore provided by 28 U.S.C. § 1292(a)(1). In such circumstances, our review would be limited to the injunctive aspects of the court's order. Cf. *Western Elec. Co. v. Milgo Elec. Corp.,* 568 F.2d 1203, 1208 (5th Cir.), *cert. denied,* 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978).

**102.** Our action should in no way be taken as an indication that Kraft's position is meritorious. That is a decision better left to the district court.

Kraft's trademark for the word mark "Polar B'ar". Isaly asserted below and again on appeal that Kraft abandoned this trademark. We agree with Isaly and therefore reverse the ruling of the district court on this issue.

From 1929 to 1932, Southern Dairies, Inc. sold an ice cream novelty under the name "Polar B'ar". Based on that use, Southern was issued trademark registration No. 254,111 for the "Polar B'ar" word mark. The trademark registration was periodically renewed and, through merger, Kraft acquired it. There is no evidence that Kraft or its predecessor used the trademark at any time between 1932 and 1980. In late 1979 or early 1980, Kraft chose to use the name "Polar B'Ar" for its new ice cream novelty after a Kraft new product development manager noticed the name on a list of unused Kraft trademarks. Since 1980, Kraft has used the word mark "Polar B'ar" extensively in connection with the sale of ice cream novelties.

 Whether Kraft's Polar B'ar trademark should be cancelled due to abandonment presents a novel question of law. Section 45 of the Lanham Act provides:

A mark shall be deemed to be "abandoned"—(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Non use for two consecutive years shall be prima facie abandonment." [103]

Section 14 of the Lanham Act provides for the cancellation of abandoned marks.[104] In most cases, the abandonment issue involves a situation in which, at the time of the petition for cancellation, the use of the mark by its owner is nonexistent or virtually nonexistent. This case is novel because Kraft was using the mark extensively at the time Isaly petitioned for cancellation.

Isaly does not argue that Kraft's current use of the mark is insignificant and, indeed it is beyond dispute that abandonment would be out of the question had Kraft used the mark continuously from 1932 to 1980 in the same manner that it is now using the mark. Rather Isaly contends that Kraft's nonuse between 1932 and 1980 caused the mark to be abandoned and Kraft's registration to be void. Isaly asserts that Kraft's subsequent use beginning in 1980 does not retroactively cure its past abandonment. We agree.

For purposes of illustration, we examine what rights Kraft had in the Polar B'ar trademark as of 1978. There is no question that Isaly would have been successful if it had sought to cancel Kraft's Polar B'ar trademark on abandonment grounds in 1978. At that time, neither Kraft nor its predecessor had used the mark since 1932, almost a half a century. Thus, Kraft had discontinued use and the only question would be whether Kraft intended to resume use. Kraft's nonuse establishes a prima facie case of abandonment,[105] thereby placing the burden on Kraft to establish its intent to resume use.[106]

At the outset, Kraft contends that it never intended to abandon the mark. That is, however, irrelevant. The proper inquiry is whether Kraft intended to resume meaningful commercial use of the mark, not whether it intended to abandon the mark.[107] Trademark rights flow from use, not from intent to protect rights. Were the rule otherwise, a party could hold trademarks that it never intended to use but did not want to allow others to use. The Lanham Act does not permit such warehousing of trademarks.

The only evidence Kraft presented to establish its intent to resume use was that it had renewed the registration of the mark in 1949 and 1969. Given the circumstanc-

**103.** 15 U.S.C. § 1127.

**104.** 15 U.S.C. § 1064.

**105.** 15 U.S.C. § 1127 (two years nonuse establishes prima facie abandonment).

**106.** *E. Remy Martin & Co. v. Shaw-Ross Int'l Imports, Inc.,* 756 F.2d 1525, 1532 (11th Cir. 1985) (once prima facie abandonment estab-lished, burden of proof shifts to trademark holder to "demonstrate that circumstances did not justify the inference of intent not to resume use").

**107.** *Exxon Corp. v. Humble Exploration Co.,* 695 F.2d 96, 102–03 (5th Cir.1983).

es, however, this is insufficient to rebut the prima facie proof of abandonment.[108] Therefore, were we to turn the clock back to 1978 and examine Kraft's Polar B'ar trademark at that time, cancellation due to abandonment would be required because Kraft discontinued use with intent not to resume use.

Kraft asserts, however, that its resumption of use of the trademark in 1980 precludes our cancelling the registration of the mark. This argument can be broken down into two parts. First, Kraft may be arguing that its use in 1980 negatives the conclusion that as of 1978 Kraft did not intend to resume use. This argument deserves short shrift. That Kraft in fact used the mark in 1980 does not mean that Kraft intended to use the mark in 1978. Not until one of Kraft's personnel noticed the mark on a list of unused trademarks in 1979 did Kraft have any present intention to use the mark. Therefore, our previous conclusion that Isaly would have prevailed had it sought cancellation in 1978 is not changed by Kraft's resumption of use in 1980.

A more difficult question is whether in 1986 Kraft's 1980 use precludes our cancelling its registration because of abandonment. In *Mission Dry Corp. v. Seven-Up Co.*,[109] the Court of Customs and Patent Appeals held that, once abandoned, a mark may be cancelled even after its holder resumes commercial use.[110] The propriety of this position is bolstered by the analogous case presented when a competitor that has used the mark in question in the interim between the discontinuance and resumption of use by the holder of the registered trademark petitions for cancellation. In *Conwood Corp. v. Loews Theatres, Inc.*,[111] the Trademark Trial and Appeal Board was confronted with that scenario and ruled that if the holder's initial discontinuance of use is an abandonment, the competitor may cancel the registration notwithstanding subsequent use.[112] The rationale for the holding in the case involving an intervening use by a competitor makes clear that cancellation is proper even in the absence of such a use. In a case involving intervening use, the competitor's right to cancel the registration flows not from the competitor's use of the mark but from the holder's abandonment. Irrespective of whether a competitor has used the mark in question, a registered trademark, once abandoned, may be cancelled even after the holder resumes use of the mark.[113]

The ruling of the district court denying Isaly's petition to cancel Kraft's trademark registration is therefore reversed.[114]

## CONCLUSION

We affirm the district court's finding that Kraft infringed Isaly's trade dress rights under § 43(a) of the Lanham Act and Isaly's trademark rights under § 32(1)(a) of that act. We also affirm the district court's rejection of Kraft's laches defense. The court's injunctive order is affirmed except for that portion of the order prohibiting Kraft from featuring the color royal blue on an ice cream bar wrapper. With respect to that portion of the order, we reverse and remand the matter

**108.** *Id.* at 99–102, and cases cited therein; *E. Remy Martin & Co.,* 756 F.2d at 1533.

**109.** 193 F.2d 201 (C.C.P.A.1951).

**110.** *Id.* at 203–04.

**111.** 173 U.S.P.Q. 829 (T.T.A.B.1972).

**112.** That the holder may have resumed use before the competitor petitioned for cancellation is irrelevant; the rights, lost as a result of abandonment, are not revived by a subsequent use. *Id.* at 830.

**113.** *See also* Callmann, *The Law of Unfair Competition, Trademarks, and Monopolies* § 19.67, at 276 (4th Ed.1983). Because the Polar B'ar

trademark had retained no goodwill in 1980 from its use between 1929 and 1932, we need not decide whether a different conclusion would be necessary if the mark still possessed goodwill from its previous use.

**114.** This is not to say that Kraft has no rights in the mark "Polar B'ar". To the contrary, Kraft has all rights that normally flow from the *use* of an unregistered mark. *Id.* Moreover, Kraft is free to register the Polar B'ar word mark, but unless and until it successfully does so, it will not be able to take advantage of the additional rights provided for trademarks registered under the Lanham Act.

to the district court with instructions to tailor a more narrow order that is not inconsistent with this opinion. We reverse the court's conclusion that the Polar B'ar trademark registration should not be cancelled. We do not reach the issue of Isaly's entitlement to damages, we leave the initial determination on that issue to the district court.

AFFIRMED in part, REVERSED in part and REMANDED.