THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing:                                          Mailed:
March 4, 2008                                     April 22, 2008

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

Lesley Hornby a/k/a Lesley Lawson a/k/a Twiggy

v.

TJX Companies, Inc.
_____

Cancellation No. 92044369
_____

Howard C. Miskin of Stoll, Miskin & Badie for Lesley Hornby
a/k/a Lesley Lawson a/k/a Twiggy.

Larry C. Jones, Jason M. Sneed, Anne J. Randall and Noelle
T. Valentine of Alston & Bird LLP for TJX Companies, Inc.
_____

Before Seeherman, Hohein and Rogers, Administrative
Trademark Judges.

Opinion by Seeherman, Administrative Trademark Judge:

Lesley Hornby a/k/a Lesley Lawson a/k/a Twiggy, an

individual, (hereafter "petitioner") has petitioned to

cancel a registration owned by TJX Companies, Inc.

(hereafter "respondent") for the mark TWIGGY for "clothing,

namely, children's pants, tops, slacks, skirts, vests,

sweaters, shirts and blouses."[1]  The grounds asserted in the petition to cancel, as listed in paragraph 19, are likelihood of confusion (one element of which, of course, is priority of use), false suggestion of a connection, fraud, and dilution.[2]

In connection with her likelihood of confusion claim brought under Section 2(d) of the Lanham Act, 15 U.S.C. §1052(d), petitioner alleges that she is an internationally-known model and actress; that she began her career in the mid-1960s, adopting the name Twiggy, and that under this name she achieved wide recognition and popularity in Europe and the United States; that petitioner "had developed and still enjoys extensive goodwill and recognition throughout the United States and the world with respect to this name and mark"; that "the mark TWIGGY has been used by Petitioner for many years prior to use by Respondent and is still being used by Petitioner"; that petitioner has used and is using the TWIGGY mark on clothing; and that respondent's mark so resembles petitioner's mark, as previously used in the United States, as to be likely to cause confusion, mistake or to deceive.

---

[1]  Registration No. 2364842, issued on July 4, 2000, from an application filed on January 29, 1997; Section 8 affidavit filed.
[2]  The paragraph also asserts that respondent's registration "tends to damage Petitioner's goodwill in its [sic] trademark," but we do not regard this as a separate statutory ground, as it relates more to petitioner's standing, and to the likelihood of confusion and dilution grounds.

With respect to the false suggestion of a connection claim under Section 2(a) of the Trademark Act, 15 U.S.C. §1052(a), petitioner alleges that the TWIGGY name is unmistakably associated with petitioner, and that when used on goods, it points uniquely and unmistakably to petitioner; that petitioner is not connected in any way with respondent or its activities; and that petitioner is of "sufficient fame and name to the consumer" that a connection with petitioner would be presumed when respondent's mark is used on respondent's goods. Petitioner also alleges that respondent had knowledge of the public recognition of the name TWIGGY as referring to petitioner when it filed the application for the registration that is now in issue, and that respondent employs the mark TWIGGY with the intent to appropriate the goodwill and recognition that have accrued to petitioner.

As for the fraud claim, petitioner alleges that respondent's registration was obtained fraudulently in that the declaration submitted as part of respondent's application is false with respect to the statement that "no other person, firm, corporation or association has the right to use said mark in commerce either in the identical form or in such near resemblance thereto as may be likely, when applied to the goods or services of such other person, to cause confusion, to cause mistake or to deceive."

3

Petitioner alleges that this statement is false because respondent's TWIGGY mark is a direct copy of petitioner's identical mark and respondent "was aware that it was Petitioner's mark at the time the application was sworn to due to the Petitioner's worldwide fame and recognition long prior to the application date of Respondent's mark." Petitioner further alleges that respondent made this statement with the intent to induce the U.S. Patent and Trademark Office (hereafter USPTO) to grant its registration, and that the USPTO did rely on the truth of the statement in granting respondent's registration.

Although petitioner listed headings for the allegations regarding certain of her grounds, e.g., "false suggestion of connection with petitioner," "fraud by respondent," petitioner did not create a separate heading for her claim that respondent's registration "is likely to dilute the distinctive quality of Petitioner's trademark," and we therefore regard the allegations made throughout her petition as also relating to this ground.

In its answer respondent admits that petitioner is not connected in any way with the activities performed by respondent under its mark, and that when it filed its application it was aware "of a former British model who had used the name 'Twiggy' in conjunction with her modeling services in the 1960s." Respondent has otherwise denied the

4

salient allegations in the petition to cancel.  Respondent has also asserted laches as an affirmative defense,[3] alleging that it has used the mark on children's clothing since about September 30, 1997, that petitioner did not oppose its application when it was published for opposition on July 20, 1999; that petitioner had constructive notice of respondent's registration on July 4, 2000, when the registration issued; that petitioner did not file the instant petition for cancellation until March 28, 2005; that petitioner's delay in asserting her claim is unreasonable; that during this period of delay respondent invested in and built up goodwill in its mark, selling hundreds of thousands of units of children's clothing annually; and that if the petition for cancellation is granted, respondent will incur economic prejudice and other detriment.

The parties have briefed their respective positions, and both were represented at an oral hearing before the Board.

**Procedural Issues**

Preliminarily, we must discuss a number of procedural issues and objections that were raised in the briefs and at the oral hearing.  The first is that we must determine what grounds are properly before us.

---

[3] Respondent, in a footnote to its brief, correctly acknowledges that laches is not a defense to a claim of fraud, a point we discuss infra.

Petitioner asserted at p. 7 of her brief, under the heading "Statement of the Issues," that the issues include the pleaded grounds of false suggestion of a connection, likelihood of confusion, and dilution. Although fraud was pleaded in the petition for cancellation and included in the brief's "Statement of the Issues," petitioner has changed the basis of this claim; specifically, in the brief petitioner asserts that respondent committed fraud on the USPTO by filing a declaration of use under Section 8 of the Act because respondent never used the mark TWIGGY in connection with the goods listed in the registration. Petitioner has also listed two unpleaded grounds: that respondent failed to obtain the written consent of petitioner to registration of her name (Section 2(c) of the Trademark Act, 15 U.S.C. § 1052(c)); and that respondent has abandoned its mark because it discontinued use thereof with the intent not to resume use (Section 45 of the Trademark Act, 15 U.S.C. § 1127).

We must first determine whether these unpleaded grounds, i.e., the altered fraud claim, the failure to obtain petitioner's written consent to registration of her name, and abandonment of the registered mark, were tried by the express or implied consent of the parties, such that we can treat the pleadings to be amended pursuant to Rule 15(b) of the Federal Rules of Civil Procedure. We find that they

6

have not been.  Petitioner's claims of fraud based on the filing of a false declaration of use under Section 8, and of abandonment, are based on responses to interrogatories that were provided by respondent.  These responses were submitted as evidence by petitioner during its rebuttal testimony period.[4]  It is obvious that grounds based on evidence that was not submitted until rebuttal could not have been tried by consent of the parties.  Respondent could not have been aware that these were grounds at the time it made its evidence of record, since there was no evidence relating to these grounds at that time.[5]  Accordingly, these grounds have not been further considered.  As for the ground that respondent failed to obtain petitioner's consent to the registration of her name, the basis petitioner gave at the oral hearing for her position that this ground was tried was an interrogatory (not of record) that asked respondent whether it had obtained petitioner's consent.  We further note that during her testimony deposition petitioner stated that respondent never asked her for permission to use the

---

[4]  Respondent has objected to this evidence as being improper rebuttal, an objection which we discuss infra.
[5]  The discovery responses on which petitioner bases her claim were served on her on July 13, 2005, well before the close of discovery and the opening of the testimony periods.  If petitioner believed that the interrogatory responses provided her with additional grounds for cancelling respondent's registration, she could have filed a motion for leave to amend her pleading at that time.  Petitioner has given no reason why she failed to file such a motion, and instead waited until her rebuttal testimony period in order to submit evidence in support of unpleaded claims.

mark TWIGGY, nor did she ever authorize or consent to such use.  p. 49.  However, because one of the elements of the pleaded Section 2(a) false suggestion of a connection ground is that the defendant is not connected with the plaintiff, respondent could reasonably have viewed this interrogatory and/or testimony as going to the Section 2(a) claim, rather than a separate Section 2(c) ground.  Because we cannot say that respondent was on notice that petitioner was asserting a Section 2(c) ground, we find that this claim was not tried.

As noted above, petitioner changed the nature of her fraud claim in her list of the issues set forth in her brief.  However, elsewhere in her brief she has continued to argue that respondent committed fraud by making false statements in the declaration of its underlying application.  Respondent has responded to these arguments in its brief.  Accordingly, the issue of fraud with respect to allegedly false statements in the declaration of the original application remains part of this proceeding.

Turning from the pleadings to the evidence, respondent has raised a number of objections to petitioner's testimony.  First, asserting that they are improper rebuttal, respondent has objected to the interrogatory responses, discussed above, which petitioner submitted during her rebuttal testimony period.  To the extent that petitioner seeks to

use this evidence to support the newly raised grounds for cancellation of abandonment and of fraud due to a false Section 8 filing, we have already stated that these grounds will not be further considered. However, respondent has asserted the affirmative defense of laches. The burden of demonstrating laches is on the respondent, and therefore it was appropriate for petitioner to submit evidence during her rebuttal testimony period with respect to this defense. The evidence submitted by petitioner concerning respondent's use or nonuse of its mark goes to the "prejudice" element of the laches defense. Therefore, respondent's objection is overruled, and the interrogatory responses have been considered solely in regard to respondent's laches defense.

Respondent has also made a number of objections to the testimony of Lesley Hornby a/k/a Lesley Lawson a/k/a Twiggy and the exhibits submitted therewith. See pages 8-15 of respondent's brief. Respondent has grouped its objections into categories, and we will therefore address each group.

As one category of objections, respondent asserts, relying on Consorzio del Prosciutto di Parma v. Parma Sausage Products Inc., 23 USPQ2d 1894 (TTAB 1992), that any activities or events pertaining to petitioner and occurring subsequent to the issuance of respondent's registration cannot be considered. With respect to the Section 2(a) claim, respondent is correct that we must determine the

extent of petitioner's fame or reputation as of the time respondent's registration issued.  However, we may still consider activities that occurred subsequent to that registration date in order to make a determination as to petitioner's fame or reputation as of the issuance of the registration.  In other words, evidence of petitioner's fame or reputation *after* the date of issuance of respondent's registration may tell us something about the fame or reputation as of that date.  Of course, the more time that has passed since the registration date, the less probative the activities are with respect to the plaintiff's fame or reputation at the time the registration issued.  Activities occurring many years after the registration date would obviously be too distant in time to inform a determination about fame or reputation as of the registration date.  However, in the present case respondent's registration issued in 2000, so petitioner's activities in the few years that passed between that date and the date of trial may still have probative value.  Further, with respect to petitioner's likelihood of confusion claim, our determination is based on the factual situation as of the time of trial, not at the time the registration issued.  See, for example, Teledyne Technologies Inc. v. Western Skyways Inc., 78 USPQ2d 1203 (TTAB 2006) (in a cancellation action involving a claim under Section 2(d), the Board

10

considered lack of actual confusion through time of trial).

Respondent's comments at the oral hearing that this would be unfair to a registrant who had invested money in its registration are addressed by the affirmative defense of laches, which can be asserted against a Section 2(d) claim, and by the statute itself, which limits such a ground to registrations that are less than five years old. This group of objections is therefore overruled.

The second group of objections relates to petitioner's activities in other countries. Because evidence of fame or reputation in other countries may have relevance to the extent that consumers in the United States would be aware of her as a result of these activities, we will not exclude this evidence, but will give it only the probative weight to which it is entitled.

The third group of objections is that certain exhibits are hearsay or unauthenticated and testimony based thereon is equally unreliable. Our first problem with these objections is that they were not timely raised. At petitioner's testimony deposition she identified several exhibits, and during the deposition respondent raised no objection to them at all. Therefore, petitioner did not have an opportunity to provide testimony that might have authenticated them. Further, the fact that petitioner was not a sponsor of the websites, excerpts from which were

11

submitted as Exhibits 4 and 5, is irrelevant. Petitioner testified that the statements made in the website excerpts about her were correct and, therefore, although statements made in websites might otherwise be considered hearsay, here we may consider the exhibits for the truth of the statements made therein.[6]

The fourth objection is to Exhibit 12, which is a copy of petitioner's U.S. Registration No. 2757883 for TWIGGY for perfumes and personal care products in Class 3, and the testimony related thereto. Respondent claims that because this registration issued, and the underlying application was filed, after respondent's registration, it is irrelevant. The fact that petitioner has obtained a registration is not irrelevant, and respondent's objection really goes to the probative value of the registration, which we discuss infra. Accordingly, we will consider the exhibit and the testimony regarding it.

The final group of objections concerns petitioner's redirect testimony, which respondent asserts was outside the

---

[6] In her reply brief petitioner says that the exhibits "are not offered for the truth of the statements of the websites discussing these events [her movies, television films, television and talk show appearances, etc.], but for the factual events themselves." p. 11. It is not clear to us what distinction there is between "the truth of the statements of the websites" and "the factual events themselves," but the next sentence points out that petitioner testified that the factual information contained in the websites was accurate. Accordingly, we treat the testimony and accompanying exhibits as stating that the factual information in the websites is accurate.

scope of cross-examination.  Although we agree that respondent did not ask any questions about petitioner's appearances in a television film and an off-Broadway production, and therefore her testimony during redirect about these activities was beyond the scope of cross-examination, we note that there was testimony about these activities during direct testimony, with respect to Exhibits 3 and 4.  Therefore, although we sustain the objection with respect to this particular portion of the redirect testimony, it does not have any bearing on our determination in this proceeding.  The other objected-to redirect testimony concerns petitioner's appearances on the Conan O'Brien and Jay Leno programs in the 1990s.  During direct examination petitioner was asked whether any U.S. entertainment shows had interviews with her or segments about her.  Her response was that there were "so many," and she identified "The Johnny Carson Show," "The Merv Griffin Show," "Mike Douglas," and then she testified that in more recent years she was on celebrity magazine shows, and in particular stated that when she did a sitcom in the 1990s, she did "all those shows."  p. 42.  During cross-examination, respondent asked her specifically about her appearances on the Johnny Carson, Mike Douglas and Merv Griffin television programs.  On redirect, petitioner was asked about, and testified to, appearances on the Conan

O'Brien show in the early or mid-90s, and on the "Tonight Show" with Jay Leno. We do not regard this testimony regarding appearances on particular programs as beyond the scope of cross-examination. The questions asked during cross-examination elicited the information that petitioner made appearances on national talk shows only in the 1970s and 1980s, and the redirect testimony corrected the impression that these were the only times that she gave such interviews. Therefore, we overrule the objection regarding this particular testimony.[7]

**The Record**

The record includes the pleadings; the file of the registration sought to be cancelled; and the testimony, with exhibits, of petitioner Lesley Hornby a/k/a Lesley Lawson a/k/a Twiggy. Petitioner has submitted, under notice of reliance, a status and title copy of a registration for TWIGGY for various skin care products, cosmetics, toiletries and hair care preparations.[8] Respondent has submitted, under notice of reliance, copies of three third-party registrations for TWIGGY marks, and petitioner's responses to two of respondent's interrogatories. Petitioner has

---

[7] Even if the testimony were not considered, it would not affect the decision in this case, since during her direct testimony petitioner testified to appearances on talk shows and celebrity magazine programs during the 1990s.

[8] Registration No. 2757883, issued on September 2, 2003, owned by Twiggy Limited.

14

submitted, as rebuttal testimony, respondent's responses to four of petitioner's interrogatories.

**Findings of Fact**

Petitioner was given the nickname of "Twiggy" when a teenager, and she has been known by that name both personally and professionally since 1966. She became a professional model in 1966, at the age of 16, when she was discovered and literally became an overnight sensation. In February 1966, "The Daily Express," at that time Britain's biggest selling national newspaper, ran her photograph on the entire center page, with the headline, "Twiggy, the Face of '66." Within the first months after the feature appeared she had worked for most of the teenage magazines in England, and the top high couture magazines as well. In the summer of 1966 she modeled at the Paris collections. Because of her celebrity, she was also invited to view the couture fashion shows, which led to an article about her in "Women's Wear Daily." As a result of this article, Diana Vreeland, the editor of "Vogue," booked petitioner to come to the United States in early 1967.

Petitioner was met at the airport in New York with a large press conference which went out on "national newsreels." Her arrival in the United States followed the "British invasion," and she was given celebrity treatment similar to what The Beatles had experienced, with people

15

chasing her and girls screaming.  She could not go out on the street because of the mayhem her appearance caused.  In short, she was not merely a model, but a celebrity as well. She appeared on the top television talk shows, including "The Johnny Carson Show."

Because of her celebrity in the United States, a number of companies entered into merchandising arrangements with her to use her name and likeness on products.  The products included Twiggy lunch boxes, a Twiggy doll, Twiggy dress up paper dolls, a Twiggy board game ("Become Twiggy, The Queen of Models"), and various cosmetics products such as Twiggy eyelashes and eye shadow.  The cosmetics started in 1967 and continued until 1969 or 70, while the game was sold from about 1967 or 1968 until 1969 or 1970.  After 1970 there is no indication that the mark TWIGGY was used on any products until 1998, when the mark was used for a skin care line in the United Kingdom.  There were also other uses of the mark abroad.  In the United Kingdom petitioner's line of TWIGGY women's clothing was launched in 2005 by a mail order house called Little Woods Shop Direct.  In the same year, petitioner's TWIGGY dresses and accessories for mid-teens and upwards began to be sold in Japan in TWIGGY stores or in TWIGGY boutiques within stores.  In the United States, in 1997 or 1998, petitioner was approached by the Franklin Mint to license her name and likeness for a collectible doll.

16

This doll was first offered for sale sometime around or after April 30, 2001, which was the target date for beginning advertising. Over one million dolls were sold during the limited run, and the doll won the doll of the year award.

Petitioner became an actress in 1970, starring in a movie called "The Boyfriend," for which she won two Golden Globe awards in 1971. She also starred in a U.S. film called "W," and appeared on various television shows that were broadcast nationally in the United States, including "The Sonny and Cher Show" and the "Mike Douglas Show," on which she was a co-host for a week. In 1983-84 she starred on Broadway in a Tony-award-winning musical, "My One and Only," which got rave reviews and was a major hit. She was nominated for a Tony award for best actress in a musical. During the 18-month run of this show she did many television appearances, including appearing on the "Johnny Carson" and "Merv Griffin" shows. She was a presenter of an Oscar at the 1984 Academy Award telecast, and she also performed on that program. She starred opposite Robin Williams in an American movie, "Club Paradise," and co-starred with Shirley Maclaine in the film "Madame Sousatzka." In connection with this film, she did a publicity tour of U.S. cities in 1988.

In the 1990s petitioner performed on television and in the theater in the United States. She starred for one year

17

(1991) in a CBS television series called "Princesses."  She also made a guest appearance on the television show "The Nanny," and in 1996 co-starred with Connie Sellica in the CBS TV movie "Something Borrowed Something Blue."  In 1997 she starred in "Blithe Spirit" in a summer theater in Sag Harbor, Long Island.  This theater draws many vacationing New Yorkers.  Her performance was reviewed in "The New York Times."  In 1999 she also starred in an off-Broadway production of "If Love Were All," which was critically acclaimed, and which ran for five months in New York City. She did interviews through the years, for example, when she had a show coming out.  In connection with the sitcom "Princesses," she had interviews in "People," "Vogue" and "US" magazine.

Petitioner has also recorded various albums through the years, either as a member of the cast of shows she's been in, or as an individual recording artist, starting with the cast album for "The Boyfriend" in the early 1970s and most recently for "Midnight Blue" in 2003. Petitioner also wrote her autobiography in 1997, called In Black and White.

In 2005 she became a judge on the American television series "American's Next Top Model."

**Grounds/Defenses**

The issues which we must decide are the pleaded grounds of fraud based on false statements made by respondent in the

declaration of its underlying application; false suggestion of a connection; priority of use and likelihood of confusion; and dilution; and the affirmative defense of laches.

Laches

As the parties have recognized, laches will not lie against the ground of fraud. However, it will lie against the other pleaded grounds. The distinction lies in the fact that it is in the public interest to prohibit registrations procured or maintained by fraud, but the defense of laches is available when the rights asserted by a petitioner are personal in nature. See Treadwell's Drifters Inc. v. Marshak, 18 USPQ2d 1318 (TTAB 1990). Thus, laches is available against a false suggestion claim, see Bridgestone/Firestone Research Inc. v. Automobile Club de l'Ouest de la France, 245 F.3d 1359, 58 USPQ2d 1460 (Fed. Cir. 2001). It is also generally available against a Section 2(d) claim of likelihood of confusion.[9] See National Cable Television Association Inc. v. American Cinema Editors Inc., 973 F.2d 1572, 19 USPQ2d 1424 (Fed. Cir. 1991), in which the defense of laches was considered in connection with a cancellation proceeding brought under

---

[9] The only exception is when confusion is inevitable, because any injury to the defendant caused by the plaintiff's delay is outweighed by the public's interest in preventing confusion. Turner v. Hops Grill & Bar Inc., 52 USPQ2d 1310 (TTAB 1999).

19

Section 2(d); Christian Broadcasting Network Inc. v. ABS-CBN International, 84 USPQ2d 1560 (TTAB 2007) (because defense of laches found to apply, petition to cancel brought under Section 2(d) dismissed). As for the applicability of the laches defense to a claim of dilution, neither this Board nor our principal reviewing court has had occasion to specifically address this question with respect to the current federal dilution statute. However, as long ago as 1963, in Seven-Up Company v. Bubble Up Corp., 312 F.2d 472, 136 USPQ 210, 214 (CCPA 1963), the Court of Customs and Patent Appeals, a predecessor to the Federal Circuit, appeared to comment favorably on a finding of laches in a district court suit brought on the grounds of infringement and dilution ("the long delay of appellants which was held to constitute laches barring its recovery in a suit for trademark infringement, dilution and unfair competition is equally a bar to the present cancellation proceeding"). In any event, because the claim of dilution relates to a personal right of the petitioner, rather than being in the interest of the general public, we hold that the affirmative defense of laches is applicable to such ground. In order to prevail on the affirmative defense of laches, a defendant must establish that there was undue or unreasonable delay by the plaintiff in asserting its rights, and prejudice to the defendant resulting from the delay. Bridgestone/Firestone

Research Inc. v. Automobile Club de l'Ouest de la France, supra. Mere delay in asserting a trademark-related right does not necessarily result in changed conditions sufficient to support the defense of laches. There must also have been some detriment due to the delay. Id., 58 USPQ2d at 1463. Respondent claims that detriment is shown by the file of its registration, which it asserts shows that respondent "continued using the TWIGGY children's clothing mark at least through the September 19, 2005 filing of its Section 8 declaration." Respondent argues that "the investment made by [respondent] in that mark during the period of time through and including the March 2005 filing of [petitioner's] petition, constitutes detrimental reliance by, and economic prejudice to [respondent]." Brief, p. 29.

We do not find this argument persuasive. The fact that a Section 8 declaration was submitted in connection with a registration is not evidence of the truth of the statements made in the declaration. The mere fact that such a post registration filing can be found to have contained false statements illustrates this. Cf. Torres v. Cantine Torresella S.r.l., 808 F.2d 46, 1 USPQ2d 1483 (Fed. Cir. 1986). Accordingly, respondent cannot rely on its declaration to prove it suffered detriment. Moreover, the statement in its brief that respondent made an investment in the mark up to and through the filing of the Section 8

21

declaration is not supported by any evidence whatsoever. Accordingly, we find that respondent's affirmative defense fails for lack of proof.

At this point, we must comment on respondent's responses to petitioner's interrogatories, submitted by petitioner during her rebuttal testimony period. Petitioner asked respondent several interrogatories regarding use of the "trademark-in-suit," asking respondent to state the "date of first use of the Trademark-in-Suit" (Interrogatory No. 5); the "the type of goods and/or products including the general age group, bearing the Trademark-in-Suit that the Registrant has ever promoted, marketed, advertised, supplied or sold" (Interrogatory No. 6); whether "there has ever been a period during which the use of the Trademark-in-Suit has been discontinued for longer than two (2) months on any of the products identified in Interrogatory No. 6" (Interrogatory No. 7); and to "identify the annual volume of sales and profits made of the goods and/or products identified in Interrogatory No. 6 from the date of the first use as identified in Interrogatory No. 5 to the present" (Interrogatory No. 8). The preamble to the interrogatories contained the following definition: "As used herein, 'Trademark-in-Suit' means U.S. Registration No. 2,364,842 issued to the Registrant on July 4, 2004 for the mark TWIGGY." ¶K.

Respondent answered these interrogatories by saying "Registrant has not used Registration No. 2,364,842 (identified by Petitioner in Paragraph K as the 'Trademark-in-Suit')" (No. 5); "there are no known products or packaging bearing Registration No. 2,364,842 (identified by Petitioner in Paragraph K as the 'Trademark-in-Suit')" (No. 6); "Registrant has not used the Registration No. 2,364,842 (identified by Petitioner in Paragraph K as the 'Trademark-in-Suit') on products" (No. 7); and "inasmuch as is indicated in the Response to Interrogatory No. 6, no such products bearing Registration No. 2,364,842 have been sold in this country, such that Registrant does not have annual sales figures and profits data for such products" (No. 8).

It appears that respondent has interpreted the references to "trademark-in-suit" in the interrogatories as meaning, literally, the words "Registration No. 2,364,842" or perhaps "the entire certificate of registration No. 2,364,842." Thus, respondent has answered these interrogatories by saying it has not used the trademark-in-suit or has no products bearing the trademark-in-suit because the words "Registration No. 2,364,842" or the registration certificate itself is not used or does not appear on the goods or their packaging.

Although respondent claims not to have engaged in gamesmanship in interpreting the interrogatories as it has,

23

and asserts that drawing a distinction between a mark and a registration is not only acceptable but necessary, the Board takes a contrary view of respondent's actions. Even if we accept that the definition of "trademark-in-suit" is subject to interpretation, respondent has chosen an interpretation that does not make sense, rather than the one reasonable interpretation it could have made. However, although we disapprove of what respondent has done, its improper responses have no effect on our decision. As noted, respondent's responses are not critical to our finding that respondent has not proved its defense of laches. Nor are these responses relevant to any other issues before us because petitioner did not, upon receiving these responses, move to amend her pleading to assert the grounds of abandonment or fraud through false post registration declarations of use, and as stated previously, these issues were not tried by consent.

We turn now to petitioner's pleaded grounds.

Likelihood of Confusion

In order to prevail on her claim of likelihood of confusion (Section 2(d) of the Trademark Act), petitioner must prove both the elements of priority of use and likelihood of confusion. In her petition petitioner alleges that she has resided in the United Kingdom since earlier than the claimed date of first use by respondent. Although

the petition goes on to allege that petitioner enjoys extensive goodwill with respect to "this name and mark," the only reference to the goods and/or services with which petitioner is using the mark, and for which she claims prior rights, is clothing:

> 8. The mark TWIGGY has been used by Petitioner for many years prior to use by Respondent and is still being used by Petitioner. Petitioner never abandoned the mark. Petitioner has used and is using the TWIGGY mark on clothing.

Further, in her discussion of the various du Pont factors,[10] she indicates that it is her use of the mark TWIGGY for clothing on which she relies.[11]

---

[10] These factors were set forth in In re E.I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973), and are followed by both the Board and its primary reviewing court in determining likelihood of confusion.

[11] As noted previously, petitioner submitted a status and title copy of a registration for TWIGGY for various items in Class 3. This registration was never pleaded, and we cannot say that the issue of likelihood of confusion with respect to this registration was clearly tried, such that we could treat the pleading to be amended pursuant to Fed. R. Civ. P. 15(b). Moreover, the registration is in the name of Twiggy Limited, and therefore we cannot conclude that it is owned by petitioner. In any event, even if the registration were clearly owned by petitioner, and the issue of likelihood of confusion based on the registration had been tried, the registration would not be sufficient to establish petitioner's priority. Because this is a cancellation proceeding, as opposed to an opposition proceeding, petitioner may not merely rely on her registration alone. Compare, King Candy Company v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974) with Brewski Beer Co. v. Brewski Brothers, Inc., 47 USPQ2d 1281, 1284 (TTAB 1998) (when both parties in a cancellation proceeding have registrations, the petitioner must prove its priority). Thus, assuming petitioner's ownership of the registration, both petitioner and respondent could rely on the filing dates of the applications which issued into the registrations: the priority filing date of petitioner's application is January 5, 2000 since this application was based on Section 44(d) of the Trademark Act, while the filing date of

25

The record shows that petitioner used, through licensees, the mark TWIGGY for a variety of goods sold in the United States, including clothing. These goods were sold between 1967 and 1970. There is no evidence of any use of TWIGGY as a trademark for clothing between 1970 and January 29, 1997, the filing date of the application which matured into respondent's registration, and the earliest date on which respondent can rely in view of the fact that respondent has not submitted evidence of its use of the mark. Petitioner started using the mark again in 2005 for clothing that is sold abroad. In the United Kingdom TWIGGY clothing is sold by a mail order house called Little Woods Shop Direct, while TWIGGY clothing is also sold in Japan in TWIGGY shops.

Petitioner testified that the clothing sold by the UK and Japanese companies is available to be ordered through the Internet, and therefore could be purchased by consumers in the United States. However, petitioner provided no evidence of the number or amount of such sales, making only the general statement that these products did get to the United States. We cannot conclude from this testimony that any appreciable amount of clothing bearing the mark TWIGGY reached consumers in the United States, such that we can say

_____

respondent's application is January 29, 1997. Obviously respondent's filing date is earlier than petitioner's.

that petitioner has established common law rights based on such use.

The real question, though, is not whether the post-2000 sales of TWIGGY products are sufficient to establish common law trademark rights, since in any event they are subsequent to the filing date of respondent's underlying application. Rather, the question is whether petitioner can rely on her 1967-70 trademark use in order to demonstrate her priority.

The Trademark Act provides that "[n]onuse for 3 consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127. The statutory presumption of abandonment applies to a party's unregistered common law mark. See Miller Brewing Co. v. Oland's Breweries [1971] Ltd., 548 F.2d 349, 192 USPQ 266, 267 (CCPA 1976); L. & J.G. Stickley Inc. v. Cosser, 81 USPQ2d 1956, 1967 (TTAB 2007). Here, as noted, there is no evidence that petitioner used TWIGGY as a trademark for clothing between 1970 and the time respondent filed its trademark application in 1997 and, as far as this record is concerned, there is no clear evidence that she has used the mark TWIGGY on clothing sold in the United States even now. The present case, thus, is very similar to the situation in L. & J.G. Stickley Inc. v. Cosser, <u>supra</u>, where a 28-year period of nonuse was found to establish abandonment.

Accordingly, we must consider whether petitioner has shown, during this period of nonuse, an intent to resume use of the mark on clothing that would disprove the presumed fact of no intent to resume use. See Imperial Tobacco Ltd. v. Philip Morris Inc., 899 F.2d 1575, 14 USPQ2d 1390, 1393 (Fed. Cir. 1990); Rivard v. Linville, 133 F.3d 1446, 45 USPQ2d 1374 (Fed. Cir. 1998). Petitioner has not provided any excuse or indeed any reason at all for this long period of nonuse, nor has she provided any evidence about her plans to resume use of the mark TWIGGY on clothing in the United States. "Use" of a mark means "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. Merely because a party used a mark a long time ago and it could use the mark in the future is not sufficient to avoid abandonment. Silverman v. CBS Inc., 870 F.2d 40, 9 USPQ2d 1778, 1783 (2d Cir. 1989) (citations omitted):

> A proprietor who temporarily suspends use of mark can rebut the presumption of abandonment by showing reasonable grounds for the suspension and plans to resume use in the reasonably foreseeable future when the conditions requiring suspension abate. But a proprietor may not protect a mark if he discontinues using it for more than 20 years and has no plans to use or permit its use in the reasonably foreseeable future. A bare assertion of possible future use is not enough.

28

In short, at the time respondent filed its underlying application on January 29, 1997, we find that petitioner had abandoned her common law trademark rights in TWIGGY for clothing.[12] Moreover, petitioner's subsequent use of the mark, even if she had shown more than possible token sales in the United States, would not retroactively cure her past abandonment. See AmBRIT Inc. v. Kraft Inc., 812 F.2d 1531, 1 USPQ2d 1161, 1170 (11th Cir. 1986). See also, Stromgren Supports Inc. v. Bike Athletic Co., 43 USPQ2d 1100, 1112 (TTAB 1997):[13]

> We agree with petitioner that respondent misses the point with its arguments about its own use and Great American's later intention to use -- the point being that, by 1990, the registered mark … was abandoned. And, the earliest evidence of any intent to resume use occurred after the mark was abandoned due to a period of over two years of nonuse. That being the case, these later efforts, had actual use ever commenced, would represent a new and separate use which cannot serve to cure the abandonment.

---

[12] Although we have confined our extended discussion of petitioner's common law rights to her trademark for clothing, we add that she cannot rely on her common law rights to show priority with respect to other goods. As far as the record shows, her activities with respect to trademark use for such goods ceased in 1970, and did not recommence until after January 29, 1997. Moreover, besides not commencing until 1998, her use of TWIGGY for a line of skin care products was in the United Kingdom, with no evidence of sales in the United States.

[13] At the time this decision issued, the statute provided that a period of two years of nonuse created a presumption of abandonment. The statute was subsequently amended, and three years is now the relevant period.

29

Accordingly, petitioner cannot rely on her use of the mark TWIGGY for clothing between 1967 and 1970 to establish her priority over respondent, and her later use was subsequent to respondent's filing date, and was also abroad and insufficient to establish trademark rights in the United States. Because petitioner cannot prove priority of use of the mark TWIGGY, her likelihood of confusion claim must fail.

Dilution

In order to succeed on a claim of dilution, a plaintiff must prove that its mark is famous and distinctive, and that its mark became famous prior to the first use or constructive first use of the defendant's mark. In the present case, therefore, petitioner must establish that her mark (as opposed to her persona) became famous prior to January 29, 1997, the filing date of respondent's intent-to-use application that resulted in issuance of the registration that is the subject of this proceeding. In her brief petitioner conflates arguments about the fame of her person with the fame of her mark, but the ground of dilution, as set forth in the statute, specifically pertains to a mark:

> Dilution by Blurring; Dilution by Tarnishment.—
>
> Injunctive relief.--Subject to the principles of equity, the owner of a famous mark that is distinctive,

30

> inherently or through acquired
> distinctiveness, shall be entitled to an
> injunction against another person who,
> at any time after the owner's mark has
> become famous, commences use of a mark
> or trade name in commerce that is likely
> to cause dilution by blurring or
> dilution by tarnishment of the famous
> mark, regardless of the presence or
> absence of actual or likely confusion,
> of competition, or of actual economic
> injury.

Section 43(c) of the Trademark Act, 15 U.S.C. §1125(c).

In view of our finding that petitioner had abandoned her mark prior to the January 29, 1997 filing date of respondent's underlying application, she cannot prove that her mark was famous at that time. Accordingly, her ground of dilution fails.[14]

Fraud

The pleaded ground of fraud is based on petitioner's assertion that when respondent signed the application which matured into the registration sought to be cancelled, respondent knowingly made false statements in the declaration of that application, namely:

> To the best of his/her knowledge and
> belief no other person, firm,
> corporation, or association has the
> right to use the mark in commerce,
> either in the identical form thereof or

---

[14] Again, although we have concentrated our discussion on petitioner's use of her mark on clothing, and the subsequent abandonment of her rights in the mark for such goods, the record shows that she had not used her mark for any goods sold in the United States between 1971 and 1997, and that she had abandoned her rights in the mark TWIGGY for all of the goods on which she had used the mark in the period of 1967-1970.

> in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive.

Fraud in procuring a trademark registration or renewal occurs when an applicant knowingly makes false, material representations of fact in connection with his application. Torres v. Cantine Torresella S.r.l., supra. Petitioner claims that respondent "was fully aware that Twiggy had and has the right to use the mark TWIGGY," and that respondent "was fully aware that applying a celebrity's name to clothing may be likely to cause confusion, to cause mistake or to deceive." Brief, p. 15. It does not appear from petitioner's argument that she is claiming that respondent knew that she was using the trademark TWIGGY for clothing or related goods or services. It appears instead that the real basis for petitioner's claim of fraud relates to her claim of a false suggestion of a connection. Petitioner, based on an Office action sent to respondent in connection with the examination of respondent's underlying application, and the argument advanced by the examining attorney in that Office action, asserts that: "As the Examining Attorney correctly stated, '[a]s celebrities often use their names in connection with lines of fashion and apparel, use of the applicant's mark TWIGGY on clothing articles would likely

32

and falsely suggest a connection with the aforementioned celebrity.'"  Brief, p. 16.

The language in the declaration of an application, quoted above, tracks the language of the statute relating to likelihood of confusion.  It refers to the declarant's knowledge and belief as to another's right to use the mark in commerce with its goods or services and whether such other's use is likely to cause confusion or mistake or to deceive.  There is no evidence that respondent knew that petitioner had the right to use TWIGGY as a trademark for any goods or services with which the respondent's use would be likely to cause confusion.  As the record shows, petitioner had stopped making trademark use of TWIGGY for any goods sold in the United States in 1970, and respondent signed the declaration in its application in 1997.

Petitioner has not pointed to any cases which have held that the language in the declaration of the application requires an applicant to reveal third-party use other than trademark use, such as a person having a particular name.  Nor do we know of any such decisions.  Because of the apparent absence of case law support for petitioner's position, we cannot say, even if respondent knew there was an individual named Twiggy and that respondent's use of the mark TWIGGY could falsely suggest a connection with her,

33

that its statement in the declaration was an intentionally false statement.

Finally, a third requirement of a fraud claim is that the false statement is material, that is, that it led the Office to issue a registration that it would not have if it had been aware that the statement was false.  Here, respondent's registration file shows that in the first Office action, dated July 7, 1997, the Examining Attorney refused registration pursuant to Section 2(a) of the Trademark Act on the basis that the mark "may falsely suggest a connection with well-known British actress and personality Twiggy."[15]  The Examining Attorney was well aware that "Twiggy" was the name of a British actress and personality, also referred to by the Examining Attorney in the June 19, 1998 Office action as "a well known former supermodel who also sings and acts."  In view thereof, respondent's failure to identify petitioner when it signed the declaration in its application can hardly be considered material to the Examining Attorney's decision to allow the application.

Petitioner's ground of fraud is dismissed.

---

[15]  Obviously, the refusal was subsequently withdrawn, the application was published for opposition, and a registration ultimately issued.

False Suggestion of a Connection

The final ground which we must decide is whether respondent's use of the mark TWIGGY for children's clothing may falsely suggest a connection with petitioner. The Federal Circuit explained in University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., Inc., 703 F.2d 1372, 217 USPQ 505, 508 (Fed. Cir. 1983), that the purpose of the false suggestion of a connection language of Section 2(a) was to protect "the name of an individual or institution which was not a 'technical' trademark or 'trade name' upon which an objection could be made under Section 2(d)," and that this statutory section embraces the concepts of the right of privacy and the related right of publicity. See In re White, 80 USPQ2d 1654 (TTAB 2006). The Federal Circuit further stated that to succeed on such a ground the plaintiff must demonstrate that the name or equivalent thereof claimed to be appropriated by another must be unmistakably associated with a particular personality or "persona" and must point uniquely to the plaintiff. The Board, in Buffett v. Chi-Chi's, Inc., 226 USPQ 428 (TTAB 1985), in accordance with the principles set forth in Notre Dame, required that a plaintiff asserting a claim of a false suggestion of a connection demonstrate 1) that the defendant's mark is the same or a close approximation of plaintiff's previously used name or identity; 2) that the

35

mark would be recognized as such; 3) that the plaintiff is not connected with the activities performed by the defendant under the mark; and 4) that the plaintiff's name or identity is of sufficient fame or reputation that when the defendant's mark is used on its goods or services, a connection with the plaintiff would be presumed. This Buffett test has been followed by the Board in subsequent decisions. See In re North American Free Trade Association, 43 USPQ2d 1282 (TTAB 1997); In re Nuclear Research Corp., 16 USPQ2d 1316 (TTAB 1990). However, in some of the decisions involving the false suggestion of a connection ground the language of the second factor has been modified somewhat, to state "that the marks would be recognized as [the same as, or a close approximation of, the name or identity previously used by the other person], in that they point uniquely and unmistakably to that person." See L. & J.G. Stickley Inc. v. Cosser, supra at 1972; In re White, supra; In re Urbano, 51 USPQ2d 1776 (TTAB 1999); In re Wielinski, 49 USPQ2d 1754 (TTAB 1998). This modified language recognizes the requirement set forth by the Federal Circuit that the name claimed to be appropriated by the defendant must point uniquely to the plaintiff.

There is no real dispute in this case as to factors one and three. The evidence clearly shows that petitioner is known, both personally and professionally, as "Twiggy," and

that respondent's mark TWIGGY is identical to petitioner's name.  It is also clear that she is not connected with respondent, and did not give respondent permission to use her name as a trademark for its goods.

With respect to the fourth factor, respondent asserts that its mark TWIGGY would not be recognized as petitioner's name because petitioner's name or identity is not of sufficient fame or reputation that consumers seeing it on children's clothing would presume a connection with petitioner.  Petitioner, obviously, takes the opposite position.

As previously discussed, the fame or reputation of petitioner must be determined as of the time respondent's registration for TWIGGY issued.  Thus, although petitioner may have been a major celebrity in the late 1960s, the burden on petitioner is to show that she had sufficient fame and/or reputation as of July 4, 2000.

There is no question that petitioner was a huge sensation in the late 1960s, a model who was also a celebrity.  Certainly if her fame and reputation were considered during the period of 1967-1970, that fame would easily satisfy the prong of the <u>Buffett</u> test requiring that the plaintiff's name or identity be of sufficient fame or reputation that when the defendant's mark is used on its goods or services, a connection with the plaintiff would be

37

presumed.  What we must consider, then, is whether since that time she has retained a sufficient degree of fame or reputation that, as of July 4, 2000, a connection with her would still be presumed by consumers seeing the mark TWIGGY on children's clothing.  We find that she has.

Petitioner is not simply a model who made a name for herself more than 30 years ago and then disappeared from public view.  On the contrary, through the years she has continued to play a public role, and has appeared before the public in vehicles which gave her significant national exposure.  As noted previously, during the 1970s she starred in a U.S. film called "The Boyfriend," for which she won two Golden Globe awards, and appeared on various television shows that were broadcast nationally in the United States, including "The Sonny and Cher Show" and the "Mike Douglas Show," on which she was a co-host for a week.  In the 1980s she starred in a major Broadway hit and Tony-award winning show for 18 months, and was herself nominated for a Tony award.  She performed on one of the Academy Award telecasts, and was also a presenter.  She also made many appearances on nationally seen television interview shows, including "Johnny Carson" and "Merv Griffin."  She starred in movies opposite such "name" actors as Robin Williams and Shirley Maclaine.  In the 1990s she had a presence on U.S. television, starring for one year (1991) in a U.S.

38

television series, and in a TV movie in 1996.  She also performed in theatrical productions in the United States, starring in a 1997 summer theater production that was reviewed in "The New York Times" (a newspaper with national circulation), and starring for five months in 1999 in an off-Broadway production that was positively reviewed.

She did interviews through the years, for example, when she had a show coming out, and she also did a publicity tour of U.S. cities to publicize her film "Madame Sousatzka."  In connection with the sitcom "Princesses," she had interviews in "People," "Vogue" and "US" magazine.

These various entertainment activities, and the promotional efforts surrounding them, have successfully kept her name before the U.S. public, and have built on the extraordinary initial reputation and celebrity that was created in the period from 1967-1970.  We do not say that her post-1970 activities would, on their own, be sufficient to demonstrate the requisite recognition, but they are sufficient when taken together with the phenomenal amount of publicity and recognition she received in that initial period.  As further evidence of her reputation and recognition in 2000, the year that respondent's registration issued, we take judicial notice[16] that the fourth edition of

---

[16]  The Board may take judicial notice of dictionary definitions. University of Notre Dame du Lac v. J. C. Gourmet Food Imports

The American Heritage Dictionary of the English Language,
published in 2000, listed "Twiggy" as an entry, as follows:

> Originally Lesley Hornby.  British model
> who epitomized the ultrathin look popular
> from 1966 to 1976.

In addition, we think it is significant that in 1999 the Franklin Mint asked petitioner to license her name and likeness for a collectible doll.  The other dolls in this collection were Jackie Kennedy, Princess Diana, Marilyn Monroe and Elvis Presley.  Although the doll did not go on the market until after respondent's mark was registered, the fact that the Franklin Mint asked petitioner to be part of its doll collection, and the stature of the other dolls in the collection, indicates that her fame was considerable and still ongoing during 1999, the year prior to the issuance of respondent's registration, and that consumers would, at that time, recognize her name.  The subsequent sale of a million TWIGGY dolls confirms this.  Although the sales of the dolls occurred shortly after the issuance of respondent's registration, they are still indicative of her reputation in 2000.[17]

---

Co., Inc., 213 USPQ 594 (TTAB 1982), aff'd, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

[17] At footnote 3 of its brief, p. 20, respondent states that there is no evidence as to how many TWIGGY dolls were sold in the United States.  However, The Franklin Mint, the licensee that sold the dolls, is a United States company.  Because respondent did not raise this question during cross-examination, we have assumed that the sales of a United States company were in the United States.  However, even if not all of the million dolls were sold in the United States, it would not affect our decision

In sum, we find that petitioner and her name, Twiggy, had sufficient fame and reputation in 1999 and 2000, both prior to and at the time respondent's mark was registered, that purchasers of children's clothing would, upon seeing the mark TWIGGY on such goods, presume an association with her. In reaching this conclusion, we have not considered petitioner's appearances on "America's Next Top Model" in 2005 and thereafter, and the publicity generated as a result of these appearances. Nor have we considered her activities in countries outside the United States; there is no evidence in the record that information about such activities reached or had an impact on U.S. consumers.

Respondent has argued that purchasers of children's clothing would not be aware of petitioner's activities in 1967-1970, when she was a phenomenon. Essentially respondent is asserting that people who knew of petitioner in that time period are now too old to buy children's clothing, and that there is no evidence that "a new generation of adult consumers" would be aware of the 1960s model Twiggy. Brief, p. 19. We accept that purchasers who were too young to have been exposed to the "Twiggy phenomenon," or were born after 1970, would not necessarily be aware of petitioner or her name through her various

herein inasmuch as a substantial portion of such number undoubtedly were sold in this country.

41

entertainment activities subsequent to 1970. We also accept that in 2000, the year respondent's mark was registered, and therefore the date as of which we must determine whether the mark falsely suggested a connection with petitioner, some of these people would be purchasers of children's clothing. For example, a girl born in 1970 would have been 30 in 2000, and could have a child age 6-10 for whom she would buy children's clothing. However, girls who were 8-17 years old in 1970 would have been aware of petitioner at that time, and, at least at the younger age range, would have been the purchasers of the board game Twiggy the Queen of Models, the dress-up paper dolls and the other licensed products. These same girls would have been 38-47 years old in 2000, and are likely to have had children at that time who would wear "children's clothing," since such clothing can be worn by 12-13 year olds. See Twiggy dep., p. 29. In other words, these women could have given birth when they were in the age range of 25 to 34 and, therefore, have been purchasers of children's clothing in 2000. And not to belabor the point, but it is not unusual for women to continue to have children when in their late 30s or early 40s, and therefore even women who were in their late teens or early 20s in 1967-1970 could have been consumers of respondent's goods in 2000. Further, even if their own children were too old in 2000 to wear children's clothing, the people who knew of petitioner

in 1967-1970 are still potential purchasers of children's clothing, for their friends' children or even for their own grandchildren.  Moreover, while we have addressed our comments to women as the purchasers of children's clothing, we must also recognize that fathers may purchase clothing for their children, and they do not have the biological issues that women do.  Because of petitioner's great celebrity during 1967-1970, men as well as women, and boys as well as girls, would have been very aware of her, and may, in 2000, have been purchasing clothing for their children.

Accordingly, petitioner has satisfied the fourth factor set forth in Buffett, that petitioner's name is of sufficient fame or reputation that when the respondent's mark is used on children's clothing, a connection with petitioner would be presumed.

Finally, we consider the second factor, whether respondent's mark would be recognized as pointing uniquely and unmistakably to the petitioner.  As we have discussed at length, "Twiggy" had been the personal and professional name of petitioner for more than 30 years at the time respondent's registration issued, and her name was of sufficient fame or reputation that consumers would make a connection between children's clothing sold under the mark TWIGGY and petitioner.  The evidence supporting our finding

43

that her name has fame and/or reputation also demonstrates that the name "Twiggy" is unmistakably associated with petitioner.  Further, on this record, we find that TWIGGY points uniquely to petitioner.  Respondent has pointed out that "twiggy" has a dictionary meaning and, although it has not submitted a copy of it, we take judicial notice that "twiggy" means "1. Resembling a twig or twigs, as in slenderness or fragility. 2. Abounding in twigs: *a twiggy branch.*"[18]  Respondent has also submitted three third-party registrations, two for the mark TWIGGY for bicycles and for entertainment services presenting a live squirrel water skiing behind a boat, and one for the mark TWIGGY STARDOM for entertainment services consisting of live musical performances and a web site featuring musical performances, etc.

The requirement that a respondent's mark point "uniquely" to petitioner does not mean that TWIGGY must be a unique term.  Rather, in the context of the respondent's goods, we must determine whether consumers would view the mark as pointing only to petitioner, or whether they would perceive it to have a different meaning.  Thus, if the respondent's goods were a plant food or a plant, the mark TWIGGY used on them could very well be understood as having

---

[18]  The American Heritage Dictionary of the English Language, 4th ed. © 2000.

44

the dictionary meaning quoted above. However, there is nothing in the record from which we can conclude that TWIGGY for children's clothing would have such a meaning. Although it is not respondent's burden to explain why it adopted its mark, respondent's choice not to do so means we do not have any explanation which might show that the term has another significance when used for children's clothing. In fact, the obvious connection between models and clothing is further support for our conclusion that respondent's mark for children's clothing points uniquely to petitioner.[19]

As for the third-party registrations submitted by respondent, we repeat the Board's statements in In re White, supra at 1659-60 (citations omitted):

> Further, the actual copies of third-party registrations and applications are not evidence that the marks which are the subjects thereof are in use and that the public is familiar with the use of those marks. In this regard, we note that applicant has pointed to no case law holding that third-party registrations and/or applications should be accorded significant weight in our analysis of a Section 2(a) false suggestion refusal. In this case, we are unable to conclude from the third-party MOHAWK registrations and

---

[19] In saying this, we want to be clear that it is not necessary, in order to succeed on a Section 2(a) false suggestion of a connection ground, that the plaintiff show that consumers would believe the defendant's goods emanate from the plaintiff. That is a requirement for a Section 2(d) likelihood of confusion claim, but not a Section 2(a) claim. We point to petitioner's fame as a model not to show that consumers would expect her to be associated with the sale of clothing, but because consumers are likely to associate clothing and models, and therefore to view the mark TWIGGY as pointing to petitioner.

> applications that the public is aware of the marks shown therein such that the term "Mohawk" does not point uniquely to the Mohawk tribe.

At the oral hearing respondent's attorney explained that respondent was aware that third-party registrations do not prove that the marks are in use or that the public is aware of them, and they were being submitted only to show that others had adopted the mark TWIGGY, and therefore the term was not unique. Again, the question is not whether the term is unique but whether, as used on the respondent's goods, it would point uniquely to petitioner. Third-party registrations can, of course, be used to show that a term has a particular significance within an industry, in the same way that dictionaries are used. See Tektronix, Inc. v. Daktronics, Inc., 534 F.2d 915, 189 USPQ 693 (CCPA 1976). However, the three registrations submitted by respondent are not for goods or services even remotely related to clothing, so they are of no value in showing that TWIGGY for children's clothing would have a meaning that does not point to petitioner. In short, the three third-party registrations have no probative value in showing that the name "Twiggy" does not point uniquely to petitioner.

After considering all of the evidence of record in connection with the Section 2(a) false suggestion of a connection factors, we find that respondent's mark TWIGGY

for children's clothing may falsely suggest a connection with petitioner.

**Conclusion**

We find that petitioner has proven her Section 2(a) ground of false suggestion of a connection, but has failed to prove her pleaded grounds of likelihood of confusion, dilution, and fraud.  We also find that respondent has failed to prove its affirmative defense of laches.

Decision:  The petition to cancel is granted on the ground that respondent's mark may falsely suggest a connection with petitioner.